Anne ANDERSON, et al.,
Plaintiffs, Appellees,

v.

CRYOVAC, INC., et al.,
Defendants, Appellees.

Globe Newspaper Company,
Intervenor, Appellant.

No. 86–1221.

United States Court of Appeals,
First Circuit.

Argued Sept. 3, 1986.

Decided Nov. 5, 1986.

E. Susan Garsh, with whom Jonathan M. Albano, Kathleen M. Guilfoyle and Bingham, Dana & Gould, Boston, Mass., were on brief, for intervenor, appellant.

James O'Connell, Sally, O'Connell & Fitch, Boston, Mass., Jane E. Kirtley and Robert S. Becker, Washington, D.C., on brief, for The Reporters Committee for Freedom of the Press, amicus curiae.

Henry Paul Monaghan, with whom William J. Cheeseman, James K. Brown, Sandra L. Lynch and Foley, Hoag & Eliot, Boston, Mass., were on brief, for defendant, appellee Cryovac, Inc.

Before BOWNES and TORRUELLA, Circuit Judges, and CARTER,* District Judge.

BOWNES, Circuit Judge.

This is an appeal by the Globe Newspaper Company (the Globe), intervenor in a civil law suit brought by certain residents of Woburn, Massachusetts, against Cryovac, Inc., and the John J. Riley Co. The suit alleged that the defendants contaminated Woburn's water supply resulting in serious injury and death to certain individuals. This appeal is not concerned with the

* Of the District of Maine, sitting by designation.

merits of the tort action; it is directed to orders the district court made prior to the start of trial denying the Globe access to discovery materials. The district court issued two protective orders that prohibited the parties from divulging information obtained through discovery except to public health and environmental officials, the parties' experts, and, with certain limitations, to the producers of a television program. The Globe also challenges the district court's refusal to grant it access to documents submitted to the court by the plaintiffs in connection with motions to compel the production of documents and to quash a deposition subpoena.

There are five issues: (1) whether the protective orders are appealable; (2) whether the first amendment is implicated when a protective order is issued in civil litigation; (3) whether a court may selectively allow access to discovery materials; (4) whether the district court had expeditiously ruled on the motions to modify and vacate the protective orders; and (5) whether there is a public right of access to documents submitted to a court for its use in deciding civil discovery motions.

## I. BACKGROUND

On May 14, 1982, a number of Woburn, Massachusetts, residents commenced a civil action alleging that Cryovac, Inc., a division of W.R. Grace & Co., the John J. Riley Co., a division of Beatrice Foods, and other unidentified companies had contaminated Woburn's drinking water by discharging toxic chemicals into the ground. The plaintiffs sought damages for personal injury and wrongful death and also asked the court to require the companies to clean up the contaminated ground water and to enjoin future unauthorized discharges of toxic substances.

The plaintiffs attributed a high incidence of cancer, as well as several cases of childhood leukemia, liver disease, and other illnesses in the Woburn area to the city's drinking water, which they claimed the defendants contaminated with hazardous chemicals. These allegations elicited much public attention, and the interrogatories and depositions obtained during extensive discovery proceedings became attractive sources of information for the news media.

On September 4, 1985, after more than three years of discovery, the district court, concerned that the publicity surrounding the trial would make it difficult to obtain an impartial jury and conduct a fair trial, issued a protective order. The order prohibited the parties, their counsel, consultants, and experts from making public statements about the suit. The order also forbade the parties from divulging any information based on documents, testimony, or other matters obtained through discovery or by agreement except to "duly constituted environmental or health authorities of the federal, state, county or local Woburn governments."

On September 26, 1985, the WGBH Education Fund and the Chedd-Angier Production Co. (WGBH) were allowed to intervene in the action. WGBH wanted access to the protected information for production of a documentary for the Public Broadcasting Service's "NOVA" television series. The district court vacated the September 4 protective order and issued a new protective order on October 8, 1985. The October 8 order did not forbid public statements about the suit, but it did continue the prohibition on divulging information obtained through discovery. It contained an exception for the parties' experts, who, "in the course of academic courses and symposia and in articles in learned journals, but excluding press releases and interviews to be published by media of general distribution," were allowed to reveal the protected information if such disclosure was unrelated to the case. On October 16, 1985, the court made another exception to the protective order when it granted WGBH's request for access to discovery materials and permitted them to conduct interviews with the parties' attorneys, consultants, and experts. WGBH was prohibited from revealing the information it obtained from these sources until after jury selection. The program did not appear until after the

**4**

jury had been selected; the jury was advised of the program and instructed not to watch it.

The Globe intervened "in the public interest" on December 12 asking access to discovery materials. One day later CBS, Inc., (CBS) intervened to obtain information for a segment of its "60 Minutes" television program. The Globe and CBS were allowed to intervene, but the court refused to grant them access to the protected information.[1] The court did make available to them papers it had considered in deciding summary judgment motions.

On January 14, 1986, the Globe made a specific request for access to papers tendered to the court by the plaintiffs' counsel in connection with motions to compel the production of documents and to quash the deposition subpoena of W.R. Grace & Co.'s chairman of the board. The papers were submitted under seal pursuant to a confidentiality stipulation that the parties had entered into on December 31, 1985. By the terms of the agreement any party could designate as confidential discovery information that it believed to be proprietary. Such information would then be sealed and only revealed to the parties, their attorneys, and the expert witnesses for use in preparing for the trial. The record does not indicate whether the court approved the stipulation. The Globe was refused access and the matter was referred to the magistrate charged with oversight of the stipulation for a determination as to whether the documents were covered by the agreement. The record does not disclose whether this was done. At the January 14 hearing, the Globe also requested an expedited determination of motions made on December 12 and 13 to modify and vacate the October 8 protective order. This request was again made in a motion on January 21. On January 21 the court denied all motions to modify or vacate the protective order. The October 8 order remained in effect until February 25, 1986, by which time the jury had been selected. One portion of the trial was completed with a jury

verdict on liability. The case has now been settled.

## II. APPEALABILITY

◼ We first consider whether the Globe's appeal became moot when the protective order was vacated or when the case was settled. Federal jurisdiction is limited to actual cases and controversies; if there is no live case or controversy the appeal usually is moot. *See Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976). The protective orders arguably are not live controversies for two reasons. First, they were vacated when the jury had been selected; the Globe has had access to the sought-after discovery materials since that time. Second, the underlying tort action has been settled. The Supreme Court has held, however, that an issue is not moot if it is "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see also Press-Enterprise Co. v. Superior Court,* —— U.S. ——, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); *Gannett Co. v. DePasquale,* 443 U.S. 368, 377–78, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979); *Nebraska Press Assn. v. Stuart,* 427 U.S. at 546–47, 96 S.Ct. at 2796–97; *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). This exception applies if: (1) "there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again"; and (2) "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Weinstein v. Bradford,* 423 U.S. at 149, 96 S.Ct. at 348.

There is little doubt that "the same complaining party [will] be subjected to the same action again." *Id.* The Globe probably will face similar protective orders in its

---

1. CBS is not a party to this appeal.

future news-gathering efforts. The issues raised on appeal about the use of such orders to deny access to discovery materials are unsettled and important; indeed, they implicate the first amendment to the Constitution. Thus, the issues are "capable of repetition." *See Gannett Co. v. DePasquale,* 443 U.S. at 377–78, 99 S.Ct. at 2904; *In re Reporters Committee for Freedom of the Press,* 773 F.2d 1325, 1329 (D.C.Cir.1985).

A protective order issued to prevent public dissemination of discovery information prior to trial also is likely to be "too short in its duration to permit full review." *Gannett Co. v. DePasquale,* 443 U.S. at 377, 99 S.Ct. at 2904. The District of Columbia Circuit recently considered whether a sealing order in effect until the end of trial met this test. Judge Scalia, writing for the court, said that the issue was "whether, without considering the possibility of expedited review (which would of course make the 'evading review' test virtually impossible to meet), a sealing order is normally insusceptible of review before completion of trial in the case in which it is entered." *In re Reporters Committee for Freedom of the Press,* 773 F.2d at 1329. The court held that the orders would evade review because they usually would last no longer than two years—the typical period between the beginning of discovery and completion of the trial—and this period had been held by the Supreme Court to be "short enough to cause action which would be mooted if not reviewed within that time to evade review." *Id.* at 1329 (citing *Southern Pacific Terminal Co. v. ICC,* 219 U.S. at 514–16, 31 S.Ct. at 283).

Protective orders similarly would evade review. They necessarily will be in effect for less time than the sealing order the District of Columbia Circuit found to be inadequate in duration to allow review. The sealing order's duration was measured from the beginning of discovery until the completion of the trial; a protective order preventing dissemination of discovery information prior to jury selection will end before the trial begins. The protective order prohibiting the Globe access to discovery materials clearly was too short in duration to be litigated before it was vacated. The Globe intervened on December 12, 1985, and moved to modify the October 8 protective order at the same time; the district court vacated the order only seventy-five days later on February 25, 1986. The issues before us are "capable of repetition, yet evading review." The appeal is not moot.

## III. THE PROTECTIVE ORDERS

### A. First Amendment Implications

There is the potential for an infringement of the first amendment whenever the government prohibits or restrains free speech or publication. The district court issued protective orders denying the Globe access to information obtained through discovery. The Globe contends that this violated its first amendment rights.

The district court issued the September 16 and October 28 protective orders pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, which allows a court to issue a protective order "for good cause shown." Because of our "concern that the government not lightly engage in any restraints on communication, particularly when the order is issued prior to the expression taking place," we have held that the good cause test incorporates a "heightened sensitivity" to the first amendment. *In re San Juan Star Co.,* 662 F.2d 108, 115–16 (1st Cir.1981). We must reconsider our holding in the light of the United States Supreme Court's recent decision in *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

Before the Supreme Court spoke in *Seattle Times,* the courts did not agree on the test for protective orders. Until 1979, the only opinion dealing with the issue had held that the first amendment was not implicated at all in a trial court's decision to restrict discovery information. *International Products Corp. v. Koons,* 325 F.2d 403, 407–08 (2d Cir.1963). In 1979, the District of Columbia Circuit took the opposite position. It held that a discovery protection

order constituted a prior restraint and must be subjected to close scrutiny. *In re Halkin,* 598 F.2d 176, 183–86 (D.C.Cir.1979). Close scrutiny requires an inquiry into three factors: the nature of the harm posed by dissemination of the information, whether the order was as narrow as possible, and whether less restrictive alternatives were available. *Id.* at 191. In *In re San Juan Star Co.,* we declined to adopt the close scrutiny test of *Halkin,* but held that because there were first amendment interests at stake when the government engages in restraints on communication, especially when the restraints are in place before the communication ensues, there should be "heightened scrutiny" of the order. *In re San Juan Star Co.,* 662 F.2d at 114–16. Heightened scrutiny requires an examination of "the magnitude and imminence of the threatened harm, the effectiveness of the protective order in preventing the harm, the availability of less restrictive means of doing so, and the narrowness of the order if it is deemed necessary." *Id.* at 116.

In *Seattle Times,* the Court reviewed a state court decision that declined to apply close or heightened scrutiny and instead applied only the "good cause" standard found in the state court equivalent of Rule 26(c). The spiritual leader of a religious group had moved for and had been granted an order to protect the identities of the group's donors and members. The Supreme Court of Washington upheld the order, concluding that the judiciary's interest in controlling the discovery process outweighed the public's interest in having access to that information. *Seattle Times Co.,* 467 U.S. at 22–29, 104 S.Ct. at 2202–05.

In examining the practice of restraining a litigant's freedom to disseminate discovery information, the United States Supreme Court applied the heightened scrutiny test set forth in *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). This standard of review applies to "incidental restrictions on First Amendment liberties by governmental action in furtherance of legitimate and substantial state interest other than suppression of expression." *Id.* at 411–12, 94 S.Ct. at 1810. The Court considered "whether the 'practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression' and whether 'the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Seattle Times Co.,* 467 U.S. at 32, 104 S.Ct. at 2207 (quoting *Procunier v. Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811). The Court found that protective orders further the important governmental interest of preventing abuse of the pretrial discovery process. *Seattle Times Co.,* 467 U.S. at 34–36, 104 S.Ct. at 2208–09. It pointed out that discovery is "a matter of legislative grace" and not "a traditionally public source of information," and that control over the process "does not raise the same specter of government censorship that such control might suggest in other situations." *Id.* at 32–33, 104 S.Ct. at 2207. Therefore, "judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context." *Id.* at 34, 104 S.Ct. at 2208. The Court held that "where, as in this case, a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment." *Id.* at 37, 104 S.Ct. at 2209.

■ *Seattle Times* has foreclosed any claim of an absolute public right of access to discovery materials. The Third Circuit has interpreted the Court's opinion as entirely eliminating the first amendment as a factor in the review of discovery protective orders, holding "that *Seattle Times prohibits* a court considering a protective order from concerning itself with first amendment considerations." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1118–

20 (3d Cir.1986) (emphasis added). We do not agree with this interpretation. The Supreme Court did not hold that the first amendment was not implicated at all when a protective order is issued. It held that the first amendment rights were implicated *"to a far lesser extent* than would restraints on dissemination of information in a different context." *Seattle Times Co.,* 467 U.S. at 34, 104 S.Ct. at 2208 (emphasis added). The Court did not hold that a discovery protective order could never offend the first amendment. It held that the first amendment is not offended if three criteria are met: (1) there is a showing of good cause as required by Rule 26(c); (2) the restriction is limited to the discovery context; and (3) the order does not restrict the dissemination of information obtained from other sources. *Id.* at 37, 104 S.Ct. at 2209. In our opinion, this means that first amendment considerations cannot be ignored in reviewing discovery protective orders. Although the "strict and heightened" scrutiny tests no longer apply, the first amendment is still a presence in the review process. Protective discovery orders are subject to first amendment scrutiny, but that scrutiny must be made within the framework of Rule 26(c)'s requirement of good cause.

The Third Circuit gained "confidence" in its interpretation that the first amendment had been read out of protective order review from two other courts of appeals decisions: *Worrell Newspapers of Indiana, Inc. v. Westhafer,* 739 F.2d 1219, 1223–24 n. 4 (7th Cir.1984), *aff'd,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), and *Tavoulareas v. Washington Post Co.,* 737 F.2d 1170, 1172–73 (D.C.Cir.1984). As we read them, however, the cited cases merely

reiterated the Supreme Court's conclusion that if the good cause standard is met, and the order is restricted to the discovery context and does not prohibit dissemination of information gained from other sources, then it does not offend the First Amendment. *Worrell Newspapers of Indiana, Inc. v. Westhafer,* 739 F.2d at 1223 n. 4; *Tavoulareas v. Washington Post Co.,* 737 F.2d at 1172–73. In fact, the District of Columbia Circuit cited *Seattle Times* not for the proposition that the first amendment was not implicated, but rather in support of the interpretation, with which we agree, "that the First Amendment does not require a court to apply *especially close scrutiny* in deciding whether" the news media have a right to disseminate discovery information. *Tavoulareas v. Washington Post Co.,* 737 F.2d at 1172 (emphasis added). That court also observed that in *Seattle Times* the "[p]roper application of the good cause requirement in the state law equivalent of Rule 26(c) was found to be a sufficient safeguard for the press." *Id.* These cases, then, did not go as far as the Third Circuit in eliminating the first amendment from the analysis; instead, they correctly identified the first amendment test to be the good cause inquiry found in Rule 26(c).[2]

■ We now consider the district court's protective orders. A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements. *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2035, at 264–65 (1970); *see also General Dynamics Corp. v. Selb Manufacturing Co.,* 481 F.2d 1204, 1212 (8th Cir.1973) (burden on movant to make specific demonstration of necessity for pro-

**2.** Appellants note that Justice Brennan's concurrence in *Seattle Times* read the majority opinion as holding that the strict scrutiny test should be applied to each issuance of a protective order. *Seattle Times Co.,* 467 U.S. at 37–38, 104 S.Ct. at 2209–10. Although the Court's opinion does not specifically identify the appropriate test for a protective order, Justice Brennan's concurrence seems inconsistent with the Court's holding: "where, as in this case, a protective order is entered on a showing of good cause ... it does

not offend the First Amendment." *Id.* at 37, 104 S.Ct. at 2209. We read the Court's opinion as applying the heightened scrutiny test of *Procunier* to the practice of restraining a litigant's right to disseminate discovery information, not to any particular application of Rule 26(c). Having found that the use of protective orders in general survived this test, the Court decided that a trial court is left with "substantial latitude" to employ, for good cause, this discovery-management device. *Id.* at 36–37, 104 S.Ct. at 2209.

tective order), *cert. denied,* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); *Koster v. Chase Manhattan Bank,* 93 F.R.D. 471, 479–80 (S.D.N.Y.1982) ("the court must find that definite criteria have been satisfied before issuing a protective order"); *cf. Schlagenhauf v. Holder,* 379 U.S. 104, 118–19, 86 S.Ct. 234, 242–43, 13 L.Ed.2d 152 (1964) (good cause under Fed.R.Civ.P. 35 must be based on more than "conclusory allegations"). We have examined the record and conclude that good cause for initially issuing the protective order was articulated sufficiently in the pretrial hearings.

The district court was concerned that the extensive publicity generated by the allegations made against the defendants, particularly the accounts appearing in the daily newspapers, would inhibit and perhaps prevent the selection of an impartial jury. Specific instances of such publicity were discussed in the hearings on the motion, and the court took judicial notice of "quite heavy stuff" appearing in the newspapers. In *In re San Juan Star Co.,* we sustained a district court's order prohibiting disclosure of deposition contents to the press or public, finding that "the massive amount of publicity" and "the emotionally-charged nature of the trial" were reasonably likely to cause "material harm to the defendants' right to a fair trial." 662 F.2d at 117. The district court's concerns were fully consistent with this reasoning. Because it was faced with specific instances of massive and potentially harmful publicity, we find there was good cause for the district court to issue the protective order.

### B. Selective Application of Protective Orders

The district court demonstrated a sensitivity to first amendment concerns by striving to keep the protective orders as narrow as possible. The press had had almost three years of unrestricted access to the products of discovery. Only when the trial was approaching did the court determine that there should be no further release of information until the jury had been select-ed. The September 4 order's prohibition on public statements was not included in the October 8 order, and the news media were allowed access to materials considered in connection with a motion for summary judgment. This action was consistent with a public right of access to materials considered in rulings on dispositive pretrial motions, a position at the farthest reaches of the first amendment right to attend judicial proceedings. *See In the Matter of Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir.1984); *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

The court's exception for disclosures to public health and environmental authorities had a compelling justification. In a case involving allegations that a city's water supply had been poisoned by toxic chemicals, the public interest required that information bearing on this problem be made available to those charged with protecting the public's health.

This limited exception for disclosures to health officials would not by itself have defeated the protective order's intended goal of preventing a saturation of potential jurors with news reports of the allegations being made against the defendants. As long as dissemination of the information was not released to the general public, the court had good cause to continue the protection. The orders, however, were not drafted to prevent those granted access to discovery materials from further disseminating the information. Indeed, the court said that it did not care if the information reached the newspapers as long as it was the environmental or health officials—federal, state, county, or local—who released it.

The hearing transcripts suggest that the court thought that restraints on the environmental and health officials' discretion to disseminate the protected information were unnecessary because they would only release the information if it was necessary to investigate a threat to the public health. Under such circumstances,

the court presumably would release the information itself. But the parties' experts were given similar, albeit more limited, authority to disseminate the information. They were allowed to divulge the information obtained from the discovery materials in their "academic courses and symposia and in articles in learned journals, but excluding press releases and interviews to be published by media of general distribution." Apparently, the case had attracted considerable attention in the academic community and the court did not want to shut off its access to the material. But nothing prevented the dissemination of the information to the general press and public as long as the release was made initially in an academic setting or "learned journal." The district court in effect gave designated individuals the ability to control public access to discovery materials. This made the protective order untenable.

█ The district court also granted WGBH, a media entity, access to the discovery materials for a program that was aired after the jury had been selected. This was consistent with the court's efforts to keep the protective order as narrow as possible. Our main concern with the exception for WGBH, however, is not with the jury's exposure to the information, but with the government's granting of access only to designated media entities. There may be a rare situation in which continued application of a protective order could be justified after one media entity but not another was granted access. We cannot, however, think of one. The district court reasoned that it could grant WGBH access and still prevent jurors' exposure to the television broadcast. But this exception gave WGBH the exclusive ability among the media to gather information and release it to the public. By the grace of the court, WGBH became a privileged media entity that could, over a four-month period, review otherwise confidential information and shape the form and content of the initial presentation of the material to the public. It is of no consequence that others could then republish the information WGBH had chosen to release. A court

may not selectively exclude news media from access to information otherwise made available for public dissemination. *See American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977); *McCoy v. Providence Journal Co.*, 190 F.2d 760, 766 (1st Cir.), *cert. denied*, 342 U.S. 894, 72 S.Ct. 200, 96 L.Ed. 669 (1951). The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the first amendment. Neither the courts nor any other branch of the government can be allowed to affect the content or tenor of the news by choreographing which news organizations have access to relevant information. The district court erred in granting access to one media entity and not the other.

### C. Expeditious Consideration of First Amendment Claims

█ The Globe also argues that the district court "erred by not expeditiously resolving the First Amendment claims brought before it." It points out that the court did not formally rule on the plaintiffs' September 26, 1985, motion to reconsider the protective order and the Globe's December 12, 1985, motion to modify the order until January 23, 1986. The January 23 order denying all motions to vacate the protective order was issued "without opinion and without articulating any findings in support of the ruling." Undue delay in responding to requests for relief from protective orders may indeed constitute an infringement of the first amendment. *See Nebraska Press Assn. v. Stuart*, 423 U.S. 1327, 1328–29, 96 S.Ct. 251, 253, 46 L.Ed.2d 237 (1975) (Blackmun, J., opinion in chambers). We find in this case, however, that the court's responses to the challenges made to the protective orders were not untimely. Although the court did not issue a written order denying the motions until almost four months after the first motion for a reconsideration was made, the court

clearly and promptly expressed during the pretrial proceedings the extent of the order and any modifications that were to be made to it. The court made its position clear as to the plaintiffs' September 26 motion at an October 3 hearing, and it issued a modified protective order on October 8 incorporating that position. As to the Globe's December 12 motion to clarify, the court's position was explained fully in the January 14 hearing and issued in order form on January 23. Under the circumstances of the pretrial proceedings in this complicated case—we count well over 100 pretrial motions with which the court had to deal—the timeliness of the court's responses to the motions on the protective orders was adequate, and the grounds for the court's conclusions were articulated sufficiently in the hearings.

## IV. THE DOCUMENTS SUBMITTED IN CONNECTION WITH DISCOVERY MOTIONS

The Globe claims both a first amendment and a common law right to see the documents tendered by the plaintiffs' counsel at the January 14, 1986, hearing. Although we agree that the public has a right of access to some parts of the judicial process, we conclude that this right does not extend to documents submitted to a court in connection with discovery proceedings.

### A. The First Amendment Right of Access

The public's first amendment right of access to judicial proceedings is still in the process of being defined. It was not until 1980 that the Supreme Court first held explicitly that any such right exists. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 564, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980). In *Richmond Newspapers,* the Supreme Court traced the history of public access to criminal trials and examined the role public participation plays in the integrity of the judicial process. The Court said that open criminal trials ensured fairness and checked perjury, misconduct, judicial bias, and partiality. *Id.* at 569, 100

S.Ct. at 2823. The court also found that open trials have a "community therapeutic value," especially in the administration of criminal justice, because they assure the public that the process is fair and just. *Id.* at 570–71, 100 S.Ct. at 2823–24.

This right of access to criminal proceedings is based on the first amendment's guarantees of freedom of speech, press, and assembly. *Id.* at 575–78, 100 S.Ct. at 2826–28. "These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.* at 575, 100 S.Ct. at 2826. The Supreme Court identified two factors as critical to its finding that the public has a presumptive right to attend criminal trials. "First, the criminal trial historically has been open to the press and general public." *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 605, 102 S.Ct. at 2619; *see also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 564–69, 100 S.Ct. at 2820–23. "Second, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 606, 102 S.Ct. at 2619; *see also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 569–73, 100 S.Ct. at 2823–25. This right is not absolute; "it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 607, 102 S.Ct. at 2620.

The Supreme Court's discussion in *Richmond Newspapers* of the history and function of public access to criminal trials has become the framework for subsequent considerations of whether the public has a right of access to other aspects of judicial proceedings. The Supreme Court recently employed this analysis when it recognized a public right of access to *voir dire* in a criminal trial. *See Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 505–10, 104 S.Ct. 819, 821–24, 78 L.Ed.2d 629 (1984). We followed this analysis when we recog-

nized a qualified right of the public to attend bail proceedings, although in that particular case we held that the accused's right to a fair trial and privacy outweighed the public's right of access. *In re Globe Newspaper Co.*, 729 F.2d 47 (1st Cir.1984). Other courts of appeals also have applied this analysis in recognizing a public right of access to criminal pretrial hearings. *See, e.g., Associated Press v. United States District Court*, 705 F.2d 1143 (9th Cir. 1983) (right of access to pretrial criminal documents); *United States v. Chagra*, 701 F.2d 354 (5th Cir.1983) (right to attend bail reduction hearings); *United States v. Brooklier*, 685 F.2d 1162 (9th Cir.1982) (right to attend *voir dire* and pretrial suppression hearings); *United States v. Criden*, 675 F.2d 550 (3d Cir.1982) (right to attend pretrial supression, due process, and entrapment hearings). These cases demonstrate that there is general agreement among the courts that the public's right of access attaches to decisions "of major importance to the administration of justice." *In re Globe Newspaper Co.*, 729 F.2d at 52.

Several courts have recognized a public right of access to civil as well as criminal trials. *See Westmoreland v. Columbia Broadcasting System, Inc.*, 752 F.2d 16, 22–23 (2d Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3478, 87 L.Ed.2d 614 (1985); *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1067–71 (3d Cir.1984); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1177–79 (6th Cir.1983); *see also In the Matter of Continental Illinois Securities Litigation*, 732 F.2d at 1308–09 (agreeing with the reasoning of those courts holding that there is a public right of access to civil trials though not specifically recognizing such a right). Other courts, while not explicitly joining those recognizing a right of access to civil trials in general, have recognized a right of access to certain fundamental aspects of civil proceedings. *See, e.g., Wilson v. American Motors Corp.*, 759 F.2d 1568 (11th Cir.1985) (presumptive right of access applied to the trial record).

The Second and Seventh Circuits have recognized a right of access to reports considered by a court in ruling on pretrial motions that were dispositive of the litigants' substantive rights. *In the Matter of Continental Illinois Securities Litigation*, 732 F.2d at 1308–10 (Seventh Circuit); *Joy v. North*, 692 F.2d at 893 (Second Circuit). These two decisions are particularly relevant here because they recognized a right of public access to at least some pretrial civil proceedings. For our purposes, the facts of both cases are essentially the same. Under state law, plaintiffs' shareholder derivative suits could be terminated by a special litigation committee, formed by the corporation, if the committee determined that it was in the best interest of the corporation to do so. The committee decided that the suit should be dropped and submitted a report in support of this conclusion. The trial court then issued a protective order prohibiting public dissemination of the report. In both cases the courts of appeals reversed. They held that the public had a right to see reports used in determining the litigants' substantive rights. In one case, summary judgment had been entered in favor of the defendants, *Joy v. North*, 692 F.2d at 884, 894; in the other, the plaintiffs agreed to dismiss the claims against some of the defendants, a result that had the same practical effect as a partial summary judgment, *In the Matter of Continental Illinois Securities Litigation*, 732 F.2d at 1310. In both cases the courts of appeals held that where the material is important and the decision to which it is relevant amounts to an adjudication of an important substantive right, that material cannot be kept from public scrutiny unless there are exceptional circumstances.

█ We need not decide here whether we agree with those courts extending a right of public access to documents considered in rulings on dispositive pretrial motions; nor need we decide whether there is a public right of access to civil trials in general. Neither of these questions is before us. We think it is clear and hold that there is no right of public access to documents considered in civil discovery mo-

tions. In making this determination, we apply the *Richmond Newspapers* inquiry into whether the proceedings in question historically have been open to the public, and whether access plays a particularly significant role in the functioning of the judicial process. *Globe Newspaper Co. v. Superior Court*, 457 U.S. at 605–06, 102 S.Ct. at 2619; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. at 564–73, 100 S.Ct. at 2820–25. We conclude that discovery proceedings are fundamentally different from proceedings to which the courts have recognized a public right of access.

The pretrial discovery process is a fairly recent invention. *See Hickman v. Taylor*, 329 U.S. 495, 500, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947) ("The pre-trial deposition-discovery mechanism ... is one of the most significant innovations of the Federal Rules of Civil Procedure.") Prior to the enactment of the Federal Rules of Civil Procedure in 1938, the parties had no effective means of discovering information and narrowing the issues; in fact, litigants were generally protected against disclosing the facts of their cases. 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2001, at 14, § 2002, at 21 (1970). "In the days before the Federal Rules of Civil Procedure, trial by ambush and secrecy was considered normal in the courts of law. No discovery tools were available to ferret out information about an opponent's claim or defense." M. Pollack, *Discovery—Its Abuse and Correction*, 80 F.R.D. 219, 220 (1979). There was no tradition of public access to depositions before 1938, and even after the enactment of discovery rules in 1938, most courts required depositions to be sealed. *In re Reporters Committee for Freedom of the Press*, 773 F.2d at 1337–38; *see also* Fed.R.Civ.P. 5(d) (courts have the authority not to require the filing of discovery requests and responses). As the Supreme Court itself observed:

> Even though the draftsmen of the Constitution could not anticipate the 20th-century pretrial proceedings to suppress evidence, pretrial proceedings were not wholly unknown in that day. Written interrogatories were used pretrial in 18th-century litigation, especially in admiralty cases.... Yet, no one ever suggested that there was any "right" of the public to be present at such pretrial proceedings as were available in that time; until the trial it could not be known whether and to what extent the pretrial evidence would be offered or received.

> Similarly, during the last 40 years in which the pretrial processes have been enormously expanded, it has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants.

*Gannett Co. v. DePasquale*, 443 U.S. at 396, 99 S.Ct. at 2913 (Burger, C.J., concurring).

Nor does public access to the discovery process play a significant role in the administration of justice. Indeed, if such access were to be mandated, the civil discovery process might actually be made more complicated and burdensome than it already is. In discovery, the parties are given broad range to explore "any matter, not privileged, which is relevant to the subject matter involved in the pending action" so that they may narrow and clarify the issues and obtain evidence or information leading to the discovery of evidence for future use in the trial. *See* Fed.R.Civ.P. 26(b)(1); *Hickman v. Taylor*, 329 U.S. at 501, 67 S.Ct. at 388. The public's interest is in seeing that the process works and the parties are able to explore the issues fully without excessive waste or delay. But rather than facilitate an efficient and complete exploration of the facts and issues, a public right of access would unduly complicate the process. It would require the court to make extensive evidentiary findings whenever a request for access was made, and this could in turn lead to lengthy and expensive interlocutory appeals, just as it did in this case. The Supreme Court declined to apply heightened first amendment scrutiny to requests for protective orders at least in part because of these concerns. *See Seattle Times Co.*, 476 U.S. at 36 n. 23, 104 S.Ct. at 2209 n. 23.

Moreover, unlike a motion for summary judgment, to which some courts have recognized a public right of access, *see In the Matter of Continental Illinois Securities Litigation*, 732 F.2d at 1308–10; *Joy v. North*, 692 F.2d at 893, a request to compel or protect the disclosure of information in the discovery process is not a request for a disposition of substantive rights. Materials submitted to a court for its consideration of a discovery motion are actually one step further removed in public concern from the trial process than the discovery materials themselves, materials that the Supreme Court has said are not subject to the public's right of access. *See Seattle Times Co.*, 467 U.S. 36–37, 104 S.Ct. at 2209. It would be an odd procedure if a trial court were forced to scrutinize strictly for first amendment implications materials it considers in support of or in opposition to a discovery motion, but it did not have to do so for the information the parties seek to uncover.

█ History and logic lead us to conclude that there is no presumptive first amendment public right of access to documents submitted to a court in connection with discovery motions. Instead, the same good cause standard is to be applied that must be met for protective orders in general.

### B. The Common Law Presumption of Public Access

█ The Globe also argues that it has a "common law right of access" to the documents submitted to the court for its ruling on the discovery motions. There is a long-standing presumption in the common law that the public may inspect judicial records. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978); *McCoy v. Providence Journal Co.*, 190 F.2d at 764–65. This presumption is more easily overcome than the constitutional right of access; when the first amendment is not implicated, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light

of the relevant facts and circumstances of the particular case." *Nixon v. Warner Communications, Inc.*, 435 U.S. at 599, 98 S.Ct. at 1312; *In re Reporters Committee for Freedom of the Press*, 773 F.2d at 1340 (trial court's "eminently reasonable action" unquestionably lawful "[i]n the absence of some overriding constitutional command to provide access"); *cf. McCoy v. Providence Journal Co.*, 190 F.2d at 765 ("[t]raditionally, courts have exercised the power to impound their records when circumstances warranted such action").

The common law presumption that the public may inspect judicial records has been the foundation on which the courts have based the first amendment right of access to judicial proceedings. It is therefore not surprising that, like the constitutional right of access, the common law presumption does not encompass discovery materials. The courts have not extended it beyond materials on which a court relies in determining the litigants' substantive rights. *See In re Reporters Committee for Freedom of the Press*, 773 F.2d at 1340, 1342 n. 3 (Scalia, J., writing for the District of Columbia Circuit, and Wright, J., dissenting, agree that the common law presumption does not go beyond evidentiary materials used in determining the litigants' substantive rights). And as we already have determined, discovery is fundamentally different from those proceedings for which a public right of access has been recognized. There is no tradition of public access to discovery, and requiring a trial court to scrutinize carefully public claims of access would be incongruous with the goals of the discovery process. In view of these conclusions, we decline to extend to materials used only in discovery the common law presumption that the public may inspect judicial records.

### V. CONCLUSION

█ We hold as follows: (1) the district court's protective orders are appealable because they are "capable of repetition, yet evading review"; (2) a protective order does not offend the first amendment

if it meets the Rule 26(c) requirement of good cause, it is restricted to the discovery context, and it does not restrict the dissemination of information obtained from other sources; (3) although the district court's decision to issue the protective orders was made for good cause, the orders became untenable because news media may not selectively be excluded from access to information otherwise made available for public dissemination; (4) the court's responses to the motions on the protective orders were timely and sufficiently articulated; and (5) the district court need only have had good cause to deny the public access to documents submitted to the court for its use in deciding discovery motions because there is no constitutional or common law right of access to such documents.

No costs.