932 F.2d 968
 18 Media L. Rep. 2221
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
C.W. HOWES, Plaintiff,
v.
ASHLAND OIL, INC., et al., Defendants-Appellants,
v.
The COURIER-JOURNAL AND LOUISVILLE TIMES COMPANY, INC., and
Ben Z. Hershberg, Non-Party Appellees.
 No. 87-5939.
 United States Court of Appeals, Sixth Circuit.
 May 6, 1991.
 
 BEFORE: DAVID A. NELSON, ALAN E. NORRIS, and HOWARD T. MARKEY,* Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from a modification of a blanket protective order (sometimes referred to as a confidentiality order) issued by the district court in connection with pretrial discovery proceedings conducted in a complex civil litigation setting. The non-party appellees--The Courier-Journal and Louisville Times Co., Inc., and Ben Z. Hershberg, one of that company's newspaper reporters--have moved to dismiss the appeal for want of a final decision appealable under 28 U.S.C. Sec. 1291. Concluding that this motion is well taken and that events occurring subsequent to oral argument have eliminated any possible basis for a grant of relief by way of mandamus, we shall dismiss the appeal without taking further action.
 
 
 2
 * C.W. Howes, who owned stock in appellant Ashland Oil, Inc., commenced a shareholder's derivative action in December of 1983. The suit, which was filed in the United States District Court for the Eastern District of Kentucky, involved allegations that Ashland's top management had violated the Foreign Corrupt Practices Act in attempting to obtain supplies of Middle Eastern crude oil.
 
 
 3
 Separate wrongful discharge actions were subsequently filed in the same court by two former Ashland employees who claimed that the company had fired them because of their unwillingness to participate in activities of the sort complained of in the shareholder's suit. One of the wrongful discharge plaintiffs, Bill E. McKay, Jr., was a defendant in the shareholder's suit. The other wrongful discharge plaintiff, Harry D. Williams, intervened in that suit as a plaintiff.
 
 
 4
 In July of 1985 plaintiffs Howes and Williams filed a motion seeking a protective order in the shareholders' suit. They asked that they not be required to give their depositions before receiving adequate responses to pending interrogatories and requests for production of documents. The motion stated that the defendants had declined to make the requested documents available until the plaintiffs signed a proposed protective order drafted by the defendants.
 
 
 5
 The district court held a hearing on the plaintiffs' motion, at which time counsel for Ashland and counsel for the chairman of its board of directors explained their position on the pending document request. With the entry of "a reasonable protective order" that would "keep these things from being ... handed to [the] newspapers the day after [they are] examined," Ashland's lawyer suggested to the court, the documents could be made available forthwith.
 
 
 6
 Under the protective order proposed by Ashland, documents that a party designated as "confidential" could not be shown or divulged to anyone outside a specified class of persons without court approval--and such documents could not be filed with the court except under seal. Counsel for the plaintiffs argued that the proposed order was too broad because it "[gave] any party the right to designate any and all documents as confidential." The district judge, however, observing that the proposed order "looks pretty standard,"[1] said that he would enter the order "at least for the time being." He added that "[i]f there are too many hassles about what's confidential and it looks like a lot of stuff has been designated confidential for no good reason, I'm very likely to just rescind it." He also warned that if the press were to "move on First Amendment grounds [that] they have access to the stuff, then we might have to reconsider whether it can be kept confidential."
 
 
 7
 On the same day that the confidentiality order was entered, Bill E. McKay (who had not been present at the hearing) moved for an order to prevent his being deposed until Ashland and its chairman produced documents that had been requested in McKay's wrongful discharge action. This motion was renewed several weeks later, at which time Mr. McKay also filed a motion to vacate the confidentiality order in the shareholders' suit. Arguing that the new order "does not ... require any showing of 'good cause' before discovery materials are sealed off from public view," the latter motion complained that Ashland had produced approximately 4,500 pages of documents in which everything--even blank pages--had been marked confidential.
 
 
 8
 The district court promptly held another hearing, in the course of which the court announced that all three cases would be consolidated for purposes of discovery. Counsel for Mr. McKay noted in response that there were some 60 boxes of Ashland documents that he had not yet seen; he reminded the court that he had challenged the confidentiality order in the shareholders' derivative suit, and he stated that "we strongly, strongly resist a confidentiality order in McKay's [wrongful discharge] suit."
 
 
 9
 The court did not find McKay's objections persuasive. Apart from its reluctance to permit disclosure of what the court referred to as "trade secrets, customer lists, secret processes, things like that"--and no one challenged Ashland's representations that the materials sought to be discovered included business information of a sort for which protection is routinely accorded, upon a showing of good cause, under Rule 26(c), Fed.R.Civ.P.--the court explained that "I don't want this case so tried in the newspapers that I can't get a jury when the time comes I have to get a jury." The fact that all of the documents produced to date had been designated as confidential was "[not] all that serious," the court commented, adding that if McKay's counsel "had some legitimate reason to want to disclose it to somebody, I'd probably [permit] it." The court also remarked that "[i]f the press comes in and says, 'Yes, we're interested in this,' I think I'd probably have to let them look into it because of their [First Amendment] freedom."
 
 
 10
 The court did agree to minor modifications concerning disclosures to the government and to prospective employers. These modifications were incorporated in an order entered on August 19, 1985, which order also effected the formal consolidation of the wrongful discharge cases with the shareholders' derivative suit. As a housekeeping matter, presumably, the order directed that all discovery be filed in the latter case. We do not interpret this as a directive to file with the court all documents produced for inspection in the consolidated discovery proceedings. On the contrary, the order expressly directed the parties to try to agree on the use of a document depository; such a depository was eventually established in the offices of a law firm in Lexington, Kentucky, and many of the documents placed in the depository were never filed with the court.
 
 
 11
 A settlement of the shareholders' derivative suit was approved by the court in 1987, but only after the parties in the consolidated proceedings had engaged in what plaintiff Howes' lawyer aptly characterized as a "horrendous discovery process," akin to "a nuclear war of discovery." More than half a million pages of documents--some 524,000, we are told--were produced for inspection and copying. In addition, we are advised, the transcripts of the depositions taken in this litigation ran to more than 30,000 pages.
 
 
 12
 As the pretrial proceedings went forward, questions regarding the permissible scope of discovery were resolved by two special masters appointed by the court. Ashland maintains that the existence of the confidentiality order encouraged the special masters to be liberal in determining what material was discoverable by the parties. The massive character of the production lends some credence to this suggestion, and it suggests that Ashland itself may have been more willing to let the litigants roam through its files, figuratively speaking, than it would have been without the protective order. Blanket protective orders, as the Manual for Complex Litigation states, "greatly expedite the flow of discovery material while affording protection against unwarranted disclosures." Id. at Sec. 21.431.[2]
 
 
 13
 Prior to the court's approval of the settlement of the shareholders' suit, Howes, Ashland, and most of the other parties agreed that the protective order should be modified to allow any interested shareholder to review discovery materials placed in the document depository at Lexington. At a hearing on the proposed settlement procedures, however, counsel for Mr. McKay--whose wrongful discharge case was still pending--urged the court to lift the protective order completely.
 
 
 14
 This the court declined to do. Instead it issued a revised protective order that added Ashland shareholders and their designated representatives to the class of people to whom the order allowed confidential discovery materials to be disclosed.
 
 
 15
 In April of 1987 the court received a letter from Ben Z. Hershberg, who identified himself as a business writer for the Courier-Journal in Louisville. Mr. Hershberg asked how he could get access to material designated as confidential, expressing particular interest in a memorandum that had been filed (apparently under seal) by persons who objected to the proposed settlement of the shareholders' derivative suit. The court treated the letter as a motion to compel disclosure of the memorandum. After the filing of briefs pro and con, the court suspended the protective order as to the memorandum and certain related filings.
 
 
 16
 Mr. Hershberg and his employer subsequently moved to broaden the suspension order so as to "vacate the Reissued Protective Order and allow public access to all documents filed of record...." The motion was argued at a status conference held on July 31, 1987. The settlement of the shareholders' suit had been approved by this time, but discovery was still in progress in the wrongful discharge cases; a jury trial in those cases had been scheduled for April of 1988.
 
 
 17
 Counsel for the newspaper indicated near the outset of the July 31 hearing that the paper would have "no problem" with the court's lifting the protective order only as to documents that had actually been filed with the court. Ashland's lawyer, however, stated that the pending motion was actually broader than that. To grant the motion, he suggested, "would arguably open all the documents that have been produced. That of course is what we would like to avoid."
 
 
 18
 The court acknowledged that it had no authority to give anyone access to the document depository, which it described as "essentially the auxiliary of some lawyer's office...." When "one lawyer exchange[s] documents with another," the court added, "I have no control over that." The newspaper's lawyer did not disagree, observing only that the paper's request dealt "primarily" with the documents in the court record.
 
 
 19
 The court indicated that it would lift the protective order with regard to anything filed of record, subject to the right of any party to request continued protection for trade secrets or materials that might be damaging to some individual.[3] The court further indicated, in response to an inquiry by counsel for Ashland, that although the media would be granted access to documents that had been filed of record, any existing restrictions on dissemination of confidential documents by the parties or their experts would remain in force.
 
 
 20
 Against this background counsel for Ashland, after speaking privately with counsel for the newspaper, offered to try to work out a revised protective order for submission to the court. The judge welcomed the offer. The two sides evidently failed to reach agreement, however, and each subsequently submitted its own proposed order. On August 6, 1987, the court entered the one proffered by the newspaper.
 
 
 21
 The August 6 order appeared to go further, in one respect, than the colloquy at the status conference had suggested it would. In addition to opening for public inspection all documents filed of record, subject to the right of the parties and witnesses to move for a continuation of confidential status for specified documents, the order provided that "the public and the press shall not be restricted in their access to other discovery documents (not filed of record) from other sources...." We surmise that the district court accepted this provision because of the First Amendment considerations to which the court had somewhat elliptically referred during the July 31 hearing.
 
 
 22
 Although the order recited it was not to be construed as allowing public access to the document depository maintained by Ashland, Ashland's lawyers were concerned that the quoted language would allow the plaintiffs to disclose to anyone--including Ashland's competitors--copies of confidential Ashland documents that had never been filed with the court. At a hearing held shortly after entry of the order prepared by the newspaper, Ashland sought reinstatement, with respect to non-filed confidential discovery material, of the protection that had been in effect when such material was produced for inspection and copying.
 
 
 23
 Stating that no good cause had been shown, the court declined Ashland's request. The court did, however, enter an amended order extending for several weeks the date for the filing of motions to continue confidential treatment for specifically designated trade secrets, proprietary information, and the like.
 
 
 24
 Ashland and the defendants aligned with it then filed a notice of appeal to this court. They also moved the district court to enter a stay pending appeal. The district court denied the motion, but a motions panel of this court subsequently granted such a stay. In the meantime, the newspaper and its reporter moved to dismiss the appeal on the jurisdictional ground mentioned at the outset of this opinion. The motion to dismiss was argued before the present panel in conjunction with the argument on the merits.
 
 
 25
 Some weeks after the oral argument here, and following a public "summary jury trial" (see Lambros, The Summary Jury Trial, A Report to the Judicial Conference of the United States, 103 F.R.D. 461 (1984), for a description of this settlement device), the wrongful discharge cases went to trial in the district court before an actual jury. Representatives of the press were in regular attendance, we are told, and there is no reason to doubt that they had access to any and all documents received in evidence.
 
 
 26
 At the end of the trial, which began on April 19 and ended on June 13, 1988, the jury returned verdicts for the plaintiffs in amounts totaling more than $69.5 million. The parties subsequently entered into settlements totaling $25 million.
 
 
 27
 The settlement agreements, copies of which have been filed with the district court, provided that the plaintiffs would make available to Ashland all of their copies of Ashland documents produced in discovery. Except for documents constituting "exhibits to court records, depositions or pleadings," the plaintiffs agreed to retain no copies themselves. It was further agreed that the documents returned to Ashland would be held in escrow for five years, at the end of which period the documents would be destroyed. No one is to have access to the documents during the escrow period, according to the settlement agreements, other than by mutual agreement of the parties or pursuant to a court order. This is the factual setting in which the newspaper's motion to dismiss the appeal must now be analyzed.[4]
 
 II
 
 28
 Under 28 U.S.C. Sec. 1291, the courts of appeals have jurisdiction over "appeals from all final decisions of the district courts of the United States...." The newspaper contends that this statute gives us no jurisdiction over the present appeal because none of the orders by which the district court modified the blanket protective order constitutes a "final decision."
 
 
 29
 Ashland and the other appellants say in response that although the challenged orders did not terminate the litigation, the orders did represent a final determination of confidentiality claims separable from and collateral to the claims on which the wrongful discharge actions turned. Given the character of their confidentiality claims, the appellants maintain, the orders rejecting those claims are appealable under the "collateral order doctrine" of Cohen v. Beneficial Indust. Loan Corp., 337 U.S. 541 (1949).
 
 
 30
 The requirements of the collateral order doctrine, we have said, are these:
 
 
 31
 "(1) that the matter appealed from must have been finally determined by the district court; (2) that the matter must be separate from, and collateral to rights asserted in the action and neither affect nor be affected by decision on the merits; and (3) that the rights asserted would be lost, probably irreparably, if review were delayed until the conclusion of proceedings in the district court." In re Post-Newsweek Stations, Michigan, Inc., 722 F.2d 325, 328-29 (6th Cir.1983).
 
 
 32
 Each of these requirements must be satisfied if the appeal is to be allowed. Our task is not to weigh finality, separateness, and irreparable loss of rights as if we were weighing factors applicable to a preliminary injunction request; if the collateral matter has not been "finally" determined, 28 U.S.C. Sec. 1291 gives us no jurisdiction regardless of how we might assess the other factors. The legislative judgment underlying the finality requirement of Sec. 1291 is one we have no authority to second-guess. See, generally, Coopers & Lybrand v. Livesay, 437 U.S. 463 (1978) (holding that denial of a motion for class action certification is not appealable under the collateral order doctrine regardless of whether, as a practical matter, it sounds the "death knell" of the litigation).
 
 
 33
 Cohen teaches that there can be no finality "[s]o long as the [collateral] matter remains open, unfinished, or inconclusive;" to be appealable under the collateral order doctrine, Cohen suggests, the district court's action on the appellant's application must be "concluded and closed...." Cohen, 337 U.S. at 546.
 
 
 34
 In the case at bar, it seems to us, the district court's action on Ashland's application for an order preserving the confidential status of Ashland's documents remains "open" and "unfinished" rather than "concluded and closed." The last two of the three orders from which this appeal was taken contained the following provision:
 
 
 35
 "Any party or witness who has produced discovery material in these actions, and designated such materials as 'confidential' under the Court's prior protective orders, may file with the Court a motion to continue confidential treatment of those discovery materials for any trade secrets, proprietary information, or other matters which fall within a recognized legal exception to the right of public access."
 
 
 36
 Parties and witnesses were given a reasonable period of time in which to move for continued confidential treatment, and the district judge made it clear that the documents for which continued protection was sought could be designated "in categories." The designation of such categories might prove burdensome, depending in part on the breadth of the categories used, but whether the task be burdensome or not, there is obviously more that remains to be done by court and counsel. Motions still have to be filed, and the motions still have to be ruled on. The question of confidentiality will not be concluded and closed until this happens; even if we give 28 U.S.C. Sec. 1291 the sort of "practical" construction endorsed in Cohen, id. at 546, we still have to say that there has been no "final" decision here.
 
 
 37
 Section Sec. 1291 is not the only statute, however, that has a potential bearing on our authority to grant relief in this matter. Ashland has invited our attention to Iowa Beef Processors, Inc. v. Bagley, 601 F.2d 949 (8th Cir.), cert. denied, 441 U.S. 907 (1979), and Cipollone v. Liggett Group, Inc., 785 F.2d 1108 (3rd Cir.1986), both of which were cases in which courts of appeals used the mandamus authority conferred by the All Writs Act, 28 U.S.C. Sec. 1651(a), to prevent disclosure of confidential information.[5] See also Bogosian v. Gulf Oil Corp., 738 F.2d 587, 591 (3rd Cir.1984), and the cases there cited.
 
 
 38
 Cipollone, interestingly enough, involved a district court's modification of blanket protective orders that had not been issued until after many of the documents in question had already been produced for inspection and copying. The modification, which was strongly influenced by the sort of First Amendment considerations referred to in the case at bar, included a requirement that the defendants who had produced these materials make a document-by-document showing that confidentiality was in fact warranted. According to the Court of Appeals for the Third Circuit, the modification reflected a serious misreading of the Supreme Court's landmark decision in Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984)--a decision, the Third Circuit said, that "prohibits a court considering a protective order from concerning itself with first amendment considerations," and "leaves no room for lower courts to consider first amendment factors in fashioning or reviewing Rule 26(c) orders." Cipollone, 785 F.2d at 1119.[6]
 
 
 39
 The "clear error of law" committed by the district court in Cipollone was held to justify mandamus relief notwithstanding the fact that there was no protective order in place when many of the documents at issue there were initially produced. It is arguable, perhaps, that the justification for mandamus relief would be at least as strong in the case at bar, where it does not appear that any of the documents at issue had been produced for inspection until after the court's entry of the protective order, and where many of the documents were never made a part of any court record. Private documents collected during discovery are not judicial records, United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir.1986), cert. denied, 480 U.S. 931 (1987),[7] and Seattle Times does unquestionably teach that private litigants have protectable privacy interests in confidential information contained in such documents. See In re Alexander Grant & Co. Litigation, 820 F.2d 352, 355 (11th Cir.1987). See also Note, Trade Secrets in Discovery: From First Amendment Disclosure to Fifth Amendment Protection, 104 Harv.L.Rev. 1330 (1991) ("Seattle Times sharply limited the extent to which non-party interests are to be considered in discovery proceedings," and "the Court rejected the assumption that discovery is a presumptively public process." Id. at 1334-35, citation omitted.)
 
 
 40
 Regardless of how we might have resolved this complex issue absent the settlement, however, it seems clear that the settlement agreements have eliminated any justification for issuance of a writ of mandamus. Ashland and the other appellants did not object to the treatment accorded the documents that had been filed of record; what they were concerned about was the documents that had not been filed. The unfiled documents that were disclosed to plaintiffs McKay and Williams during discovery have now been returned to Ashland, assuming that the settlement agreements have been complied with, and except in the unlikely event of access being provided through a new court order, no one may see these documents without the mutual agreement of Ashland and the plaintiffs. Effective control of Ashland's private business records has thus been returned to Ashland.
 
 
 41
 As far as the documents on file with the court are concerned, the public has a presumptive right to inspect and copy such documents, subject to the court's discretionary power to seal those for which there are privacy interests that outweigh the public's right to know. In re Knoxville News-Sentinal Co., Inc., 723 F.2d 470, 474 (6th Cir.1983). With the dismissal of this appeal and the lifting of our stay order, the district court will be free to set a new date by which parties or witnesses may move for continuation of confidential treatment for any part of the record as to which it is claimed that public access would be inappropriate. Ashland said it was amendable to such an approach before the settlement, and the company has even less reason to object to it now that there is no concern about the impartiality of a jury being compromised. In exercising its discretion to preserve the confidentiality of trade secrets and other proprietary information, the district court will, we are confident, be mindful of the requirements of the Fourth and Fifth Amendments. See Note, 104 Harv.L.Rev. 1330, supra. We note also that the passage of time may have diminished, if it has not altogether eliminated, any risk of Ashland's competitors gaining an unfair business advantage by being allowed to see the complete record.
 
 
 42
 For the reasons stated, the order by which we stayed the lifting of the protective order is DISSOLVED, and the appeal is DISMISSED.
 
 
 
 *
 The Honorable Howard T. Markey, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation. Judge Markey retired April 30, 1991, but voted to join this opinion before that date
 
 
 [1]
 The Manual for Complex Litigation, Second (1985), produced under the auspices of the Federal Judicial Center, contains a sample confidentiality order (id. at Sec. 41.36) quite similar to the one proposed by Ashland. The manual acknowledges "the understandable tendency of counsel to err on the side of caution by designating any possibly sensitive documents as confidential under the order," and says that although judges "should be somewhat tolerant of this practice, counsel should not mark documents as protected under the order unless they are at least arguably subject to protection." Id. at Sec. 21.431, n. 60
 
 
 [2]
 One of the Ashland lawyers who had been heavily involved in the production of documents told the court at a hearing held in July of 1987 that "in producing [the documents] we took very much into consideration the fact that the protective order was entered and [we factored the protective order into decisions] not to appeal any of the rulings of the masters, not to attempt to do anything to restrict production of documents if it were fairly within the law." But in Public Citizen v. Liggett Group, Inc., 858 F.2d 775 (1st Cir.1988), cert. denied, 488 U.S. 1030 (1989), the Court of Appeals for the First Circuit reacted somewhat unsympathetically to the argument that only under extraordinary circumstances should courts modify blanket protective orders on which parties have relied in producing documents. Blanket protective orders, entered without a showing of good cause for confidentiality as to any individual documents, are "peculiarly subject to later modification," the court said. Id. at 790
 
 
 [3]
 An order entered on August 5, 1987, to give effect to the decisions announced at the status conference provided as follows: "[S]aid Protective Order is set aside as it relates to the Official Court Record, same to be considered unsealed. All parties have to and including August 5, 1987 within which to file specific objections for consideration by the Court." This is one of three orders being challenged in the instant appeal
 
 
 [4]
 The escrow period has been running for quite some time now, and the court regrets its delay in the issuance of this opinion. The delay was solely the responsibility of the presiding judge, who tenders his apologies to the parties and their counsel
 
 
 [5]
 On motion for rehearing in Iowa Beef, the court decided to deny "formal" issuance of the writ of mandamus on the ground that once the confidential business material at issue in that case had been released to a congressional subcommittee, there was no way to put the cat back in the bag. The court stated, however, that it adhered "in general" to the views expressed in its original opinion. These included the view that it was a clear abuse of discretion, redressable by way of mandamus, for the district court to have lifted a protective order to the extent of letting the business information it covered be turned over to the subcommittee with no restrictions on its use. 601 F.2d at 956
 
 
 [6]
 In Anderson v. Cyrovac, Inc., 805 F.2d 1, 7 (1st Cir.1986), the Court of Appeals for the First Circuit expressed disagreement with this interpretation of Seattle Times. The First Circuit went on to hold, however, that "there is no right of public access to documents considered in civil discovery motions." Id. at 11-12. Pointing out that "discovery proceedings are fundamentally different from proceedings to which the courts have recognized a public right of access," and suggesting that "public access to the discovery process [does not] play a significant role in the administration of justice," the court said that "[h]istory and logic lead us to conclude that there is no presumptive first amendment right of access to documents submitted to a court in connection with discovery motions." Id. at 12-13. A fortiori, it would seem, there is no presumptive First Amendment right of access to documents not submitted to a court at all. This does not mean, however, that a right of public access cannot arise under the terms of the Federal Rules of Civil Procedure. See Public Citizen, supra, note 2, at 788-90
 
 
 [7]
 The Second Circuit's opinion in In re "Agent Orange" Product Liability Litigation, 821 F.2d 139, 146 (2d Cir.), cert. denied sub nom. Dow Chemical Co. v. Ryan, 484 U.S. 953 (1987), says that "Fed.R.Civ.P. 5(d) requires that all discovery materials must be filed with the district court, unless the court orders otherwise," but there is an important qualification to this general statement: "Rule 34, unlike other rules governing discovery, does not provide that responsive material be filed with the court and made part of the public record." Id. at 147. Documents produced for inspection during depositions upon oral examination are to be marked for identification and annexed to the transcript upon the request of a party, see Rule 30(f), Fed.R.Civ.P., and such documents may become part of the record in this fashion, but there is no corresponding provision with respect to documents that a party is allowed to inspect and copy under Rule 34
 We assume that the bulk of the documents produced in the case at bar were produced under Rule 34, not Rule 30, and were not annexed to any deposition transcript. If the existence of a "tradition of accessibility" is significant in this connection--see Cincinnati Gas and Elec. Co. v. General Elec. Co., 854 F.2d 900, 903 (6th Cir.1988), cert. denied, 489 U.S. 1033 (1989), quoting Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986)--it is worth noting that there is no tradition of public accessibility to Rule 34 documents that have not been filed with the court and that could not have been used by the court in deciding any phase of the litigation.