**UNITED STATES of America,**

v.

**THREE JUVENILES, Defendants,**

v.

**GLOBE NEWSPAPER COMPANY,**
Intervenor.

**Crim. No. 94–10181–PBS.**

United States District Court,
D. Massachusetts.

Sept. 8, 1994.

Jonathan M. Albano, Bingham, Dana & Gould, Boston, MA, for Globe Newspaper Co.

S. Theodore Merritt, U.S. Attorney's Office, Boston, MA.

## MEMORANDUM AND ORDER ON GLOBE NEWSPAPER COMPANY'S MOTION FOR ACCESS TO ARRAIGNMENT, PRETRIAL, AND TRIAL PROCEEDINGS

SARIS, District Judge.

### INTRODUCTION

On July 19, 1994, the government filed an information against three juveniles charging them with civil rights violations under the Federal Juvenile Delinquency Act (the "Act"), 18 U.S.C. §§ 5031–5042. On the same day, in a connected case, the grand jury indicted an adult, Brian Clayton, with violations of 18 U.S.C. § 241 (conspiracy to violate civil rights) and 18 U.S.C. § 371 (conspiracy to intimidate and interfere with federally protected activities on account of race). The indictment charges that Clayton committed these violations as a member of the New Dawn Hammerskins, a white supremacist group.

Just prior to the arraignments of the juveniles on July 20, 1994, the Globe Newspaper Company ("*Globe*") moved to intervene in the juvenile proceedings for purposes of gaining access to the arraignments and other subsequent proceedings, as well as any judicial documents filed in connection with those proceedings. After an access hearing on the record, the Court allowed the Globe's motion to intervene for the limited purpose of seeking access, but denied the request for public access to the arraignments pursuant to 18 U.S.C. § 5038(e). However, in light of the

important First Amendment issues as recently articulated in *United States v. A.D., PG Publishing Co.*, 28 F.3d 1353, 1357 (3rd Cir. 1994), the court agreed to take the matter under advisement. The three juveniles and the government oppose the Globe's motion for access, claiming that 18 U.S.C. §§ 5032 & 5038 require this court to close all hearings and to impound all records filed or created in connection with the delinquency proceedings and alternatively if the court has discretion, it should so exercise it. After consideration of the parties' briefs, the Globe's motion to open the delinquency proceedings is DENIED. However, the Globe's motion for access to certain documents is ALLOWED, limited by the conditions enumerated in the attached order, designed to ensure that the identity of the juveniles not be revealed.

## BACKGROUND

The following facts are necessary for the court to discuss the legal principles implicated by the Globe's motion for access. On July 20, 1994, Federal and state officials held a press conference to announce an investigation culminating in the arrests of Mr. Clayton and the three juveniles. The next day the local press gave the arrests considerable coverage: the Boston Herald ran the story on its front and several pages. Newspaper articles discussing the crimes have detailed some of the acts of the New Dawn Hammerskins, particularly those of the adult. Several juveniles were interviewed, including one who purported to reveal the identity of the other juveniles arrested. At least three newspapers have published names alleged to be the juveniles who are the subject of the information filed in the instant case. At least one paper printed a photograph of a juvenile, again claiming that he was one of those charged by the government. From the articles it can be reasonably inferred that the so-called "hate" crimes alleged are of significant interest to the communities in which they occurred and the public at large. It also appears other juveniles who have not been charged may be involved in the New Dawn Hammerskins.

Under the Act a juvenile is a person under eighteen years of age. 18 U.S.C. § 5031. Although one of the juveniles is now 18, the other two are 16, and the proceedings against them should conclude prior to their eighteenth birthdays. The government asserts, however, that all three would benefit from treatment under the Act, and consequently has not sought transfer hearings to try the juveniles as adults under § 5031.

## DISCUSSION

The Globe does not claim that the Act's confidentiality provisions, §§ 5032 and 5038, are facially invalid. Rather, the Globe asserts that this court has discretion to decide the extent to which the public will have access to the proceedings and the records. In support of this position, the Globe argues that: 1) the Act itself permits the court to weigh the need for and degree of closure on the specific facts of this case; and 2) the First Amendment and the common law compel the court to balance the government's reasons for closure with the public's right to an open forum, permitting narrowly tailored closure only to the extent that it serves a compelling government interest. Since it does not seek access to the names or personal identifying information of the juveniles, the Globe argues that any further restriction of the public's access to remaining proceedings is inappropriate in light of both the Act and the United States Constitution.

1. *The Statute*

The starting point is the language of the Act itself. Section 5032 provides that a court exercising jurisdiction over a juvenile proceeding "may be convened at any time and place within the district, in chambers or otherwise." Section 5038 further provides:

(a) Throughout and upon the completion of the juvenile delinquency proceeding, the records shall be safeguarded from disclosure to unauthorized persons. The records shall be released to the extent necessary to meet the following circumstances:

(1) inquiries from another court of law;

(2) inquiries from an agency preparing a report for another court;

(3) inquiries from law enforcement agencies where the request for information is related to the investigation of a crime or a position with that agency;

(4) inquiries, in writing, from the director of a treatment agency or the director of a facility to which the juvenile has been committed by the court;

(5) inquiries from an agency considering the person for a position immediately and directly affecting the national security; and

(6) inquiries from any victim of such juvenile delinquency, or if the victim is deceased from the immediate family of such victim, related to the final disposition of such juvenile by the court in accordance with section 5037.

Unless otherwise authorized by this section, information about the juvenile record may not be released when the request for information is related to an application for employment, license, bonding, or any civil right or privilege. Responses to such inquiries shall not be different from responses made about persons who have never been involved in a delinquency proceeding. . . .

(c) During the course of any juvenile delinquency proceeding, all information and records relating to the proceeding, which are obtained or prepared in the discharge of an official duty by an employee of the court or an employee of any other governmental agency, shall not be disclosed directly or indirectly to anyone other than the judge, counsel for the juvenile and the Government, or others entitled under this section to receive juvenile records. . . .

(e) Unless a juvenile who is taken into custody is prosecuted as an adult neither the name nor picture of any juvenile shall be made public in connection with a juvenile delinquency proceeding.

### 2. *First Amendment*

As the statute implicates First Amendment concerns, this court must construe it against the backdrop of the Supreme Court's First Amendment jurisprudence governing access to judicial proceedings. The Supreme Court has held that the First Amendment's guarantees of freedom of speech, press, and assembly provide for the public's right of access to *criminal* proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–78, 100 S.Ct. 2814, 2826–28, 65 L.Ed.2d 973 (1980) (*"Richmond Newspapers"*); *see also Anderson v. Cryovac, Inc.*, 805 F.2d 1, 10 (1st Cir.1986) (*"Anderson"*). Although "[s]everal courts have recognized a public right of access to civil as well as criminal trials," the First Circuit has not decided whether the First Amendment mandates a general right of access to civil proceedings, *Id.* at 11. Neither the Supreme Court nor the First Circuit has decided whether blanket closure of juvenile delinquency proceedings contravenes the First Amendment. *See United States v. A.D., PG Publishing Co.*, 28 F.3d 1353, 1357 (3rd Cir. 1994) (*"PG Publishing"*).

In concluding that the First Amendment provides for a presumption of public access to criminal trials, the *Richmond Newspapers* Court reasoned that public participation plays a key role in maintaining the integrity of the judicial process. *See Anderson*, 805 F.2d at 10. "The Court has said that open criminal trials ensured fairness and checked perjury, misconduct, judicial bias, and partiality." *Id.* (citing *Richmond Newspapers*, 448 U.S. at 569, 100 S.Ct. at 2823). "The Supreme Court identified two factors as critical to its finding that the public has a presumptive right to attend criminal trials." *Id.* "First, the criminal trial historically has been open to the press and general public." *Globe Newspaper Co. v. Superior Court for the County of Norfolk*, 457 U.S. 596, 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) (*"Globe"*). "Second, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Id.* at 606, 102 S.Ct. at 2619. Thus, in deciding whether a public right of access applies to a particular proceeding, a court must inquire "whether the proceedings in question historically have been open to the public, and whether access plays a particularly significant role in the functioning of the judicial process." *Anderson*, 805 F.2d at 12 (holding that civil

discovery proceedings are fundamentally different from those to which a public right of access has attached).

■ Even if the first amendment right of access attaches to a particular proceeding, that right is not absolute. *See Press–Enterprise Co. v. Superior Court of Cal.,* 478 U.S. 1, 9, 106 S.Ct. 2735, 2741, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*) (First Amendment right of access is a qualified right). For example, "there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity." *Id.* (footnote omitted). A court may also, in certain circumstances, close a hearing in order to protect young victims of sex crimes from the trauma of testifying in public. *See Globe,* 457 U.S. at 607–10, 102 S.Ct. at 2620–22. In any event, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*); *see also Globe,* 457 U.S. at 606–07, 102 S.Ct. at 2620 ("to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest").

In *Globe,* the Supreme Court considered whether a Massachusetts statute barring public access to criminal trials during the testimony of underage sex crime victims contravened the First Amendment. The state interests articulated in support of the statute were two: 1) protecting minor victims of certain sex crimes from trauma; and 2) encouraging those victims to testify and to testify in a truthful and credible manner. *Globe,* 457 U.S. at 607, 102 S.Ct. at 2620. Although the Court concluded that "safeguarding the physical and psychological well-being of a minor" was a compelling state interest, *id.* (footnote omitted), that interest could not "justify a *mandatory* closure rule",

*id.* at 608, 102 S.Ct. at 2620–21 (emphasis in original). In a telling footnote, the majority noted that its:

"holding is a narrow one: that a rule of mandatory closure respecting the testimony of minor sex victims is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex victims. But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional." *Id.* at 610–11 n. 27, 102 S.Ct. at 2622 n. 27.

With these principles in mind, the court turns to its reading of the relevant portions of the Act.

### 3. Closure of Juvenile Proceedings

■ The Globe argues that the statute does not require closure of the hearings, but gives the court discretion. *See PG Publishing,* 28 F.3d at 1361 (Section 5038(e) "provides no evidence of a congressional mandate to close all juvenile delinquency hearings and seal all records.") The Act never expressly mandates a closed hearing for a juvenile proceeding. Rather, it states that a juvenile proceeding "may be convened at any time and place within the district, in chambers *or otherwise.*" (emphasis added). While this provision, when read in isolation, appears to give the Court discretion as to whether to close the courtroom, it must be read in conjunction with Section 5038(e), which is direct and mandatory. It says that "neither the name nor the picture of any juvenile *shall* be made public in connection with a juvenile delinquency proceeding." (emphasis added).

If the court were to permit public access to the delinquency proceedings where the juveniles appear, the result is ineluctable: the juveniles' names *will* be made public. Although this provision is contained in a section entitled "use of juvenile records," the language of the provision is more broadly worded to encompass any identification "in connection with a juvenile delinquency proceeding." Closure appears to be the only way to

protect the juvenile's anonymity. The Globe's commitment not to print the names or pictures of the juveniles, while commendable, does not bind other members of the media or the public in attendance. In fact, several publications have already printed the names of the persons alleged to be the juveniles named in the information. *See Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 310, 97 S.Ct. 1045, 1046, 51 L.Ed.2d 355 (1977) (if juvenile proceeding open to public, state cannot bar press from publishing information obtained lawfully).

As the government points out, the legislative history supports the court's conclusion that the Act mandates closure of the hearing in that Congress, in conference, deleted a proposed provision in the Senate version of the 1974 proposed legislation giving the press access to the juvenile hearings. S.Rep. No. 1011, 93rd Cong., 2d Sess. 3 (1974) reported in 1974 U.S.C.C.A.N. 5283, 5321 (1974) (Section 207 of Senate Bill proposed an amendment to § 5037 which permitted press access).

■ This statutory construction passes constitutional muster. While the interests of the juvenile defendants here and the witnesses in *Globe* are unquestionably similar, the "*Globe* is not controlling in this case." *PG Publishing*, 28 F.3d at 1358. The underlying proceeding in *Globe* was a criminal trial, but here the blanket ban on public access is to an entirely different sort of proceeding which has consistently been defined by the courts as non-criminal proceedings. *See, e.g., United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir.1990). ("Under [the Act], prosecution results in an adjudication of status, not a criminal conviction").

While the Globe persuasively argues that, at least in certain circumstances, "the similarity between delinquency and criminal proceedings cannot be denied," that observation cannot alter the historical fact that the public in the country has *never* enjoyed unfettered access to juvenile delinquency proceedings. *See Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 105, 99 S.Ct. 2667, 2672, 61 L.Ed.2d 399 (1979) ("all fifty states have statutes that provided in some way for confidentiality [of

juvenile proceedings]"); *id.* at 107, 99 S.Ct. at 2673 (REHNQUIST, J., concurring) ("It is the hallmark of our juvenile justice system in the United States that virtually from its inception ... its proceedings have been conducted outside of the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity."); *Globe,* 457 U.S. at 612, 102 S.Ct. at 2623 (BURGER, C.J., dissenting) ("Historically our society has gone to great lengths to protect minors *charged* with crime, particularly by prohibiting the release of names of offenders, barring the press and public from juvenile proceedings, and sealing records of those proceedings.") (emphasis in original); *In re Gault,* 387 U.S. 1, 15, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527 (1967) (juvenile not entitled to public trial), citing *Kent v. United States,* 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966) (juvenile proceedings have generally been considered 'civil' in nature and not criminal).

Here, in Massachusetts, until 1990 there had been a "long-standing requirement" that a judge sitting in a juvenile session exclude the general public from the room. *See News Group Boston, Inc. v. Commonwealth,* 409 Mass. 627, 628, 568 N.E.2d 600 (1991) (holding constitutional amendment permitting public access to juvenile proceedings in cases involving charges of murder, Mass.Gen.L. ch. 119, § 65 (West 1993) ("except when a child is charged with murder in the first or second degree the court *shall exclude* the general public from the room, admitting only such persons as may have a direct interest in the case") (emphasis added)). *See generally* Note, The Public Right of Access to Juvenile Delinquency Hearings, 81 Mich.L.Rev. 1540, 1554 n. 72 (1983) ("In 1939, six states and the District of Columbia excluded the public from juvenile courts and twenty-four states permitted excluding the public from the juvenile courtroom.") (citation omitted).

■ One linchpin of *Richmond Newspapers* and its progeny is the "unbroken, uncontradicted history, supported by reasons as valid today as in centuries past ... that a presumption of openness adheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers,* 448 U.S. at

573, 100 S.Ct. at 2825. *Compare, e.g., Anderson,* 805 F.2d at 11–12 ("discovery proceedings are fundamentally different from proceedings to which the courts have recognized a public right of access"). And while it is undeniable that the public's scrutiny of a proceeding under the Act would "enhance[ ] quality and safeguard[ ] the integrity of the factfinding process," *Globe,* 457 U.S. at 606, 102 S.Ct. at 2619, which was the second factor relied on by the *Richmond Newspapers* plurality in determining that a qualified First Amendment right of access applies to criminal trials, *see id.* at 606 n. 14, 102 S.Ct. at 2619 n. 14, this court must conclude that the First Amendment does not guarantee a presumption of openness and access to juvenile delinquency proceedings and the records generated by those hearings. *In re J.S.,* 140 Vt. 458, 466, 438 A.2d 1125 (1981) (error for lower court to hold that qualified right of access governed delinquency proceedings); *cf. Florida Publishing Co. v. Morgan,* 253 Ga. 467, 472–73, 322 S.E.2d 233 (1984) (although there is no historically based presumption of access to delinquency proceedings, blanket closure is also not necessarily constitutional). *Compare State ex. rel Dispatch Printing Co. v. Solove (In re T.R.)* 52 Ohio St.3d 6, 16–17, 556 N.E.2d 439 (1990) ("[W]e conclude that there is no qualified right of public access to juvenile court proceedings to determine if a child is abused, neglected, or dependent, or to determine custody of a minor child."), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 396 (1990) *with In re N.H.,* 63 Ohio Misc.2d 285, 294, 626 N.E.2d 697 (Ct. Common Pleas 1992) (holding right of access does apply to delinquency proceedings).

■ Even were I to have the discretion under the Act to open the delinquency proceedings, and even if a qualified First Amendment right attaches to juvenile delinquency proceedings, I would not exercise that discretion in the circumstances of this case for the following reasons. First, the strongly stated Congressional purpose of the Act is to facilitate rehabilitation by protecting juveniles from the stigma of criminal conviction. *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 107–108, 99 S.Ct. 2667, 2673, 61 L.Ed.2d 399 (1979) (Rehnquist, J. concurring) ("Publication of the names of juvenile offenders may seriously impair the rehabilitative goals of the juvenile justice system and handicap the youth's prospects for adjustment in society and acceptance by the public."). *See United States v. Welch,* 15 F.3d 1202, 1207 (1st Cir.1993) (legislative history shows that the purpose of the act was to foster the rehabilitative concept of a juvenile proceeding and minimize involvement of young offenders in the juvenile and criminal justice systems), *cert. denied,* —— U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994); *In re Sealed Case (Juvenile Transfer),* 893 F.2d 363, 367 (D.C.Cir.1990); *United States v. Juvenile Male,* 923 F.2d 614 (8th Cir.1991). The government has not sought to have any of these juveniles transferred to adult status, and the court gives weight to that evaluation of the offenders' current prospects for rehabilitation. Two of the juveniles have no prior criminal records and thus may be particularly amenable to rehabilitation.

Second, there is some indication that other juveniles, who have not been charged, were involved in the activities of the group, and their right to confidentiality might be jeopardized in any open juvenile proceedings.

Third, the juveniles have opposed opening the proceedings. While one juvenile may have waived his interests in confidentiality by giving the press an interview, the others have not. All three juveniles have opposed public hearings. Fourth, there is no less restrictive alternative short of closing the courtroom to protect against disclosing the identity of the juveniles. The court cannot bar the media from publishing information they legally obtain. *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979).

Finally, as pointed out below, the court has reasonable alternatives which will fully protect the interests of the victims and the public embodied in the First Amendment, for example, disclosing certain records of the proceedings. In sum, after weighing the interests of the juveniles in confidentiality, and in rehabilitation, against the interests of the public, particularly the victims, to open hearings, the court concludes that closure is ne-

cessitated by a compelling governmental interest.

### 4. Court Records

■ Section 5038(a) provides that the records of a proceeding "shall be safeguarded from disclosure to an unauthorized person." Paragraphs 5038(a)(1)–(a)(6) list those persons or agencies to whom disclosure is mandatory; the final paragraph of § 5038(a) denotes to whom the act bars disclosure. Once again, this statutory language creates a degree of ambiguity. As the Third Circuit observed, "[i]f Congress intended paragraphs (a)(1) through (a)(6) to constitute an exclusive list of the situations in which access would be authorized, the concluding paragraph would be superfluous; if access was to be foreclosed in all but the situations described in paragraphs (a)(1)–(a)(6), the prohibition against disclosure in connection with applications for employment, licenses, bonding, and civil rights would not have been necessary." *PG Publishing*, 28 F.3d at 1360. Thus, the Act implicitly recognizes that trial judges should retain some discretion to determine the extent to which records of a juvenile proceeding are appropriate for the public to review.

■ In construing the statute, the court has considered the common law right of access to judicial records. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 1311–12, 55 L.Ed.2d 570 (1978). This right of access is not absolute but requires a weighing of competing interests. *Webster Groves Sch. Dist. v. Pulitzer Publishing Co.*, 898 F.2d 1371, 1376 (8th Cir. 1990) (without determining whether right of access governs civil proceedings generally, court held that closure of hearing to determine whether handicapped child who brought loaded gun to school should be enjoined from attending school was warranted since child's and other witnesses' privacy interests outweighed public's right of access, whether based on the Constitution or the common law). "Disclosure of court records is discretionary with the judge in most jurisdictions." *In re Gault*, 387 U.S. 1, 24–25, 87 S.Ct. 1428, 1442, 18 L.Ed.2d 527 (1967) ("no reason why, consistently with due process, a state cannot

continue if it deems it appropriate, to provide and improve provision for confidentiality of records of . . . . court action relating to juveniles.").

Section 5038(c), when read in conjunction with § 5038(a), does not disturb the *court's* discretion to disclose information or records relating to the proceedings in the appropriate circumstances. Rather, Section 5038(c) is directed to court and other governmental employees. Cf. *The Oklahoma Pub. Co. v. United States*, 515 F.Supp. 1255, 1258 (W.D.Okl.1981) (§ 5038(d) does not apply to the press but only to court personnel and those properly under the supervision of the court). As the Third Circuit stated it "bar[s] anyone associated with a proceeding under the Act, including the United States Attorney and the employees of any other law enforcement agency from disclosing such information to unauthorized persons." *PG Publishing*, 28 F.3d at 1360. But because the language "others entitled under this section" encompasses individuals or agencies permitted "to receive records under the authority implicitly recognized in § 5038(a)," *id.*, § 5038(c) does not evidence a congressional intent to impose a blanket ban on public access to records of juvenile proceedings under the Act.

Reading § 5038 as a whole, the court concludes that it has discretion to disclose records and information about a juvenile so long as the disclosure does not contravene the express mandate in § 5038(e) that the name and picture of the juvenile not be made public.

■ In determining whether to exercise my statutory discretion, I have considered the following factors. First, the alleged civil rights violations were public in nature, involving, among other things, painting swastikas on synagogues and harassing African-American people in public places. The acts were designed to attract public attention, and they have. Accordingly, the public interest in the proceedings is higher than in other juvenile proceedings where the transgressions involved more private concerns. Second, these juveniles are currently aged 16, 16 and 18. While still entitled to the statutory protections of privacy, if found delinquent,

they are old enough to benefit, in a rehabilitative way, from the public opprobrium attached to these charged acts. Third, as a practical matter, investigative reporting, including an interview with one of the juveniles, has already disclosed many details of the alleged transgressions. Further, many of the details have been disclosed in a related criminal prosecution of an adult. Fourth, although the First Amendment and common law presumption of openness do not attach to juvenile hearings, nonetheless the court gives great weight to the important interests they are designed to protect.

Accordingly, in balancing the juveniles' interest in privacy and rehabilitation with the public's and victims' interest in ensuring that the civil rights of all religious and racial minorities are vindicated, the Court orders that certain records be disclosed: (1) the "information," with all names and identifying information deleted; and (2) the docket, with all names and identifying information deleted. Cf. *Webster Groves School District v. Pulitzer Pub. Co.*, 898 F.2d at 1377 (making public redacted docket sheet in juvenile proceeding). This is consistent with the approach taken by the Supreme Court. *See, e.g., R.A.V. v. City of St. Paul, Minn.*, — U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (disclosing initials of juvenile and facts of case without disclosing identity of perpetrator). The Court denies the request for a transcript of the arraignment on the ground that much of that hearing concerned conditions of release and the transcript would be replete with identifying information (i.e., names of parents, places of employment, etc.). All documents and records are ordered sealed unless otherwise ordered by the Court. See Order dated July 20, 1994 (Docket 6). To the extent the press seeks access to any particular document, it shall file a motion, and serve it on all counsel to the action. This order is stayed for five days in the event any of the parties seek to exercise the right to appeal within 10 days.

### ORDER

The Globe's motion for access to arraignment, pretrial and trial proceedings is **DENIED.** The Globe's motion for access to certain court records is allowed in part. The office of the United States Attorney shall prepare for the Clerk's Office a copy of the information with all identifying information redacted within 10 days. The Clerk shall make available a docket sheet with any identifying information deleted.