UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 94-2170

UNITED STATES,
Appellee,

v.

THREE JUVENILES,
Defendants - Appellees.



GLOBE NEWSPAPER COMPANY,
Intervenor - Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Bownes, Senior Circuit Judge, 
and Selya, Circuit Judge. 



Jonathan M. Albano, with whom Mark W. Batten, Alicia L. 
Downey and Bingham, Dana & Gould, were on brief for appellant. 
Eileen Penner, Attorney, Department of Justice, with whom 
Deval L. Patrick, Assistant Attorney General, and Jessica 
Dunsay Silver, Attorney, Department of Justice, were on brief for 
appellee, United States.



July 31, 1995


TORRUELLA, Chief Judge. This appeal requires us to TORRUELLA, Chief Judge 

interpret and apply the confidentiality provisions of the Federal

Juvenile Delinquency Act (the "Act"), 18 U.S.C. 5031-5042. We

hold that the Act authorizes, but does not mandate, closure of

juvenile proceedings. Although we disagree with the district

court's interpretation of the statute, we nevertheless find that

the court's decision to close the proceedings was within its

discretion and proper under the Act.

I. I.

On July 19, 1994, the government charged three

juveniles with civil rights violations under the Federal Juvenile

Delinquency Act (the "Act"), 18 U.S.C. 5031-5042. The charges

involved "hate crimes" allegedly committed by the juveniles as

members of a white supremacist group. On the same day that the

juveniles were charged, the grand jury indicted an adult, Brian

Clayton, with violations of 18 U.S.C. 241 (conspiracy to

violate civil rights) and 371 (conspiracy to intimidate and

interfere with federally protected activities on account of

race). The indictment charges that Clayton committed these

violations as a member of the same white supremacist group to

which the three juveniles allegedly belonged.

Just prior to the juveniles' arraignments on July 20,

1994, intervenor-appellant Globe Newspaper Company (the "Globe")

moved to intervene in the juvenile proceedings for purposes of

gaining access to the arraignments and subsequent proceedings, as

well as to any judicial documents filed in connection with those

-2-

proceedings. The district court allowed the Globe to intervene

and granted it access to certain redacted court documents, but

denied public access to the arraignments on the grounds that 

5038 of the Act mandated closure of the proceedings. United 

States v. Three Juveniles, Globe Newspaper Co., 862 F. Supp. 651, 

658 (D. Mass. 1994). The court alternatively held that, even if

closure were discretionary, it would close the proceedings in

this case. See id. at 658. The Globe argues on appeal that the 

First Amendment creates a right of access to juvenile

proceedings, that the district court erred by interpreting the

Act to mandate closure of juvenile proceedings, and that the

factors set forth and relied upon by the district court in its

opinion are not sufficiently compelling to justify closure of the

proceedings.

II. II.

The issues presented by this appeal involve the

interpretation and constitutionality of certain provisions of the

Act. Because these are purely questions of law, our review is

plenary. See United States v. Gifford, 17 F.3d 462, 472 (1st 

Cir. 1994); see also United States v. M.I.M., 932 F.2d 1016, 1019 

(1st Cir. 1991) (district court's interpretation of statute is

reviewed de novo). 

The Act governs the detention and disposition of

juveniles charged with delinquency. 18 U.S.C. 5031-5037. The

statute also contains confidentiality provisions, set forth in

-3-

5032 and 5038.1 Enacted in 1938, the Act was intended "to
 

1 Section 5032 provides in relevant part that:

. . . any proceedings against [an alleged
juvenile delinquent] shall be in an
appropriate district court of the United
States. For such purposes, the court may
be convened at any time and place within
the district, in chambers or otherwise 
. . . .

18 U.S.C. 5032 (emphasis added). The second confidentiality
provision, 5038, provides that:

(a) Throughout and upon the completion of
the juvenile delinquency proceeding, the
records shall be safeguarded from
disclosure to unauthorized persons. The
records shall be released to the extent
necessary to meet the following
circumstances:

(1) inquiries received from another
court of law; 
(2) inquiries from an agency
preparing a presentence report for
another court;
(3) inquiries from law enforcement
agencies where the request for
information is related to the
investigation of a crime or a
position within that agency;
(4) inquiries, in writing, from the
director of a treatment agency or
the director of a facility to which
the juvenile has been committed by
the court;
(5) inquiries from an agency
considering the person for a
position immediately and directly
affecting the national security;
and
(6) inquiries from any victim of
such juvenile delinquency, or if
the victim is deceased from the
immediate family of such victim,
related to the final disposition of
such juvenile by the court in
accordance with section 5037.

-4-

provide for the care and treatment of juvenile delinquents."

H.R. Rep. No. 2617, 75th Cong., 3d Sess. 1 (1938). "[T]he Act's

underlying purpose is to rehabilitate, not to punish, so as 'to

assist youths in becoming productive members of our society

. . .'." In re Sealed Case (Juvenile Transfer), 893 F.2d 363, 

367 (D.C. Cir. 1990) (quoting S. Rep. No. 1011, 93d Cong., 2d

Sess. 22 (1974)); accord United States v. Welch, 15 F.3d 1202, 

1211 n.12 (1st Cir. 1993), cert. denied, 114 S. Ct. 1863 (1994). 

To this end, the Act attempts to insulate juveniles from the

stigma of a criminal record. In re Sealed Case, 893 F.2d at 367- 

68; see also S. Rep. No. 1989, 75th Cong., 3d Sess. 1 (1938) 
 

Unless otherwise authorized by this
section, information about the juvenile
record may not be released when the
request for information is related to an
application for employment, license,
bonding, or any civil right or privilege.
Responses to such inquiries shall not be
different from responses made about
persons who have never been involved in a
delinquency proceeding . . . .

(c) During the course of any juvenile
proceeding, all information and records
relating to the proceeding, which are
obtained or prepared in the discharge of
an official duty by an employee of the
court or an employee of any other
governmental agency, shall not be
disclosed directly or indirectly to
anyone other than the judge, counsel for
the juvenile and the Government, or
others entitled under this section to
receive juvenile records . . . .

(e) Unless a juvenile who is taken into
custody is prosecuted as an adult neither
the name nor picture of any juvenile
shall be made public in connection with a
juvenile delinquency proceeding . . . .

-5-

("[A] juvenile delinquent for whom there is some hope of

rehabilitation should not receive the stigma of a criminal record

that would attach to him throughout his life."). The

confidentiality provisions of the Act are therefore quite

essential to the Act's statutory scheme and overarching

rehabilitative purpose.

Based on its reading of the statute and its legislative

history, the district court held that the Act allowed it some

discretion to disclose information about juvenile proceedings, so

long as the disclosure does not contravene the "express mandate"

of 5038(e) that the juvenile's name and picture not be made

public. 862 F. Supp. at 658. This construction of the Act,

according to the district court, is also consistent with the

Supreme Court's First Amendment jurisprudence. Id. at 655-56 

(citing, inter alia, Globe Newspaper Co. v. Superior Court for 

the County of Norfolk, 457 U.S. 596, 608 (1982)). We turn now to 

the Globe's contention that the district court's interpretation

was in error.

III. III.

As the district court recognized, the Act implicates

First Amendment concerns, and thus must be interpreted with the

Supreme Court's First Amendment jurisprudence in mind. It is

well-settled that the First Amendment provides a right of public

access to most proceedings growing out of adult criminal cases. 

See Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 3 (1986) 

("Press-Enterprise II") (First Amendment provides right of access 

-6-

to transcript of preliminary hearing of a criminal prosecution);

Press-Enterprise Co. v. Superior Court of California, 464 U.S. 

501, 508-510 (1984) ("Press-Enterprise I") (First Amendment 

creates "presumption of openness" of voir dire proceedings in 

criminal case); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 

555, 580 (1980) (plurality opinion) (the public's right to attend

criminal trials is implicit in First Amendment's guarantees).2

This First Amendment right of access is not absolute, however.

Competing values and interests may warrant a denial of access to

proceedings and records in some situations. Press-Enterprise II, 

478 U.S. at 9; see also Rivera-Puig v. Garc a-Rosario, 983 F.2d 

311, 314 (1st Cir. 1992). In such a case, reviewing courts must

determine whether the closure is "essential to preserve higher

values" and "narrowly tailored to serve that interest." Press- 

Enterprise I, 464 U.S. at 510. 

Since the "Juvenile Court" movement began in this

country at the end of the last century, all states, the District

of Columbia, and Puerto Rico have adopted juvenile court systems.

See In re Gault, 387 U.S. 1, 14 (1967). The development of the 

juvenile justice system throughout the country has been marked by

a "special sensitivity" about information regarding juveniles and

"the impact that public dissemination of such information may
 

2 Although some circuits have recognized a public right of
access to civil trials as well, see, e.g., Republic of 
Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 659 (3d 
Cir. 1991), this Circuit has never decided whether the First
Amendment mandates such a general right of access. Anderson v. 
Cryovac, Inc., 805 F.2d 1, 10-11 (1st Cir. 1986). We find it 
unnecessary to do so here.

-7-

have on the youths involved." United States v. A.D., PG 

Publishing Co., 28 F.3d 1353, 1357 (3d Cir. 1994) ("PG 

Publishing"). Accordingly, many, if not most, states currently 

authorize or mandate closure of juvenile proceedings.3 The

Supreme Court has also acknowledged this tradition of

confidentiality of juvenile proceedings. See, e.g., In re Gault, 

387 U.S. at 25 ("[T]here is no reason why, consistently with due

process, a State cannot continue, if it deems appropriate, to

provide and to improve provision for the confidentiality of

records of police contacts and court action relating to

juveniles.").

The Supreme Court has never determined whether the

First Amendment right of public access attaches to juvenile

proceedings, and thus has not decided whether across-the-board

closure of such proceedings violates the First Amendment. See PG 

 

3 See, e.g., Ala. Code 12-15-65(a); Alaska Stat. 47.10.070(a); 
Conn. Gen. Stat. Ann. 54-76h; D.C. Code Ann. 16-2316(e); Ga. Code
Ann. 15-11-28(c); Hawaii Rev. Stat. Tit. 31 s. 571-41(b); Idaho
Juv. R. 22(b); Ill. Rev. Stats. Ch. 705 s. 405/l-5(6); Ky. Rev.
Stat. Ann. 610.070(3); Miss. Code Ann. 43-21-203(6); Mo. Ann.
Stat. 211.171(5); Nev. Rev. Stat. 62.193(1); N.H. Rev. Stat. Ann.
169-B:34; N.D. Cent. Code 27-20-24(5); Pa. Cons. Stat. Ann.
6336(d); R.I. Gen. L. 14-1-30; S.C. Code Ann. 20-7-755; S.D.
Codified Laws Ann. 26-7A-36; Vt. Stat. Ann. Tit. 33 s. 5523(c);
Va. Code 16.1-302; Wash. Rev. Code Ann. 13-34.110; W. Va. Code
49-5-1(d); Wis. Stat. Ann. 48-299(1)(a); Wyo. Stat. 14-6-224(b)
(all authorizing or requiring that the general public be excluded
from juvenile proceedings). See also Calif. Welf. & Inst. Code 
676(a); Me. Rev. Stat. Ann. Tit. 15 s. 3307(2)(B); Mass. Gen.
Laws Ann. ch. 119 s. 65; Minn. Stat. Ann. 260.155(c); Okla. Stat.
Ann. Tit. 10 s. 1111(A)(1); Tex. Fam. Code Ann. 54-08; Utah Code
Ann. 78-3a-33(2) (all barring the public from juvenile
proceedings except for those involving certain classes of
offenses, such as murder, or when the juvenile is older than
fifteen years). 

-8-

Publishing, 28 F.3d at 1357. In a very instructive case, 

however, the Court addressed whether the First Amendment allows a

statutory bar to public access to adult criminal trials during

the testimony of sex-offense victims who are minors. See Globe, 

457 U.S. at 607. Although the Supreme Court acknowledged the

compelling state interests of protecting the victims from further

trauma and embarrassment and encouraging other victims to come

forward, it held that neither interest sufficiently justified a

blanket closure in every case involving a youthful sex-offense

victim. Id. at 607. The Court explained: 

[A]s compelling as that interest [in
protecting the minor victims] is, it does
not justify a mandatory closure rule, for 
it is clear that the circumstances of the
particular case may affect the
significance of the interest. A trial
court can determine on a case-by-case
basis whether closure is necessary to
protect the welfare of a minor
victim. . . . Section 16A, in contrast,
requires closure even if the victim does
not seek the exclusion of the press and
general public, and would not suffer
injury by their presence. . . . In
short, 16A cannot be viewed as a
narrowly tailored means of accommodating
the State's asserted interest: That
interest could be served just as well by
requiring the trial court to determine on
a case-by-case basis whether the State's
legitimate concern for the well-being of
the minor victim necessitates closure.
Such an approach ensures that the
constitutional right of the press and the
public to gain access to criminal trials
will not be restricted except where
necessary to protect the State's
interest.

Id. Significantly, the Court added: 

-9-

We emphasize that our holding is a narrow
one: that a rule of mandatory closure
respecting the testimony of minor sex
victims is constitutionally infirm. In 
individual cases, and under appropriate 
circumstances, the First Amendment does 
not necessarily stand as a bar to the 
exclusion from the courtroom of the press 
and general public during the testimony 
of minor sex-offense victims. But a 
mandatory rule, requiring no 
particularized determinations in 
individual cases, is unconstitutional. 

Id. at 611 n.27 (emphasis added). 

In the instant case, the Globe argues that the public

does have a First Amendment right of access to juvenile

proceedings. Relying on the Court's language in Globe, 457 U.S. 

at 607-08, 611, the Globe contends that the district court's

construction of the Act as imposing "a mandatory closure

requirement on all juvenile proceedings" renders the Act

unconstitutional. Assuming arguendo that the First Amendment 

right of public access does apply to some degree to juvenile

proceedings,4 we agree that while the Globe case is not directly 

applicable here, the Court's reasoning in that case strongly

suggests that the district court's preferred reading of the Act

raises some serious First Amendment concerns.

There may, however, be no need to resolve this

potential conflict between the Act and the First Amendment. It

 

4 This is, however, a highly dubious assumption, particularly in
light of the long, entrenched, and well-founded tradition of
confidentiality regarding juvenile proceedings, and the
compelling rehabilitative purposes behind this tradition. See 
supra note 2; see also In re Sealed Case (Juvenile Transfer), 893 
F.2d 363, 367 (D.C. Cir. 1990); discussion infra section IV.  

-10-

is a well-established rule of statutory construction that "where

an otherwise acceptable construction of a statute would raise

serious constitutional problems, [reviewing courts should]

construe the statute to avoid such problems unless such

construction is plainly contrary to the intent of Congress."

DeBartolo Corp. v. Florida Gulf Coast Trades Council, 485 U.S. 

568, 575 (1988). We therefore must examine the Act's purpose and

language to determine whether it is necessary to call the Act's

constitutionality into question by construing it to mandate an

across-the-board bar to public access.

IV. IV.

As we have explained, the primary purpose of the Act is

to facilitate the rehabilitation of juvenile delinquents. In re 

Sealed Case, 893 F.2d at 367. Protection of the juvenile from 

the stigma of a criminal record by preserving the confidentiality

of proceedings is an essential element of the Act's statutory

scheme. See discussion supra at 5. 

The government argues that the Act's rehabilitative

purpose can only be effectuated by prohibiting public disclosure

of information about juvenile proceedings, and contends that the

Act's language explicitly so directs. The Globe contends,

conversely, that the Act's language does not mandate closure, but

leaves the decision to the district court's discretion, to be

determined on a case-by-case basis. In so contending, the Globe

relies heavily on PG Publishing, 28 F.3d at 1359-60, and we 

-11-

agree that the Third Circuit's reasoning in that case is quite

persuasive.

As the district court acknowledged, the Act does not

expressly require a closed hearing for a juvenile proceeding.

862 F. Supp. at 655. Section 5032 of the Act provides that

juvenile proceedings may be convened "at any time and place

within the district, in chambers or otherwise." This phrase

certainly seems to contemplate that district court judges will

exercise their discretion to determine when, where, and in what

manner juvenile proceedings will be conducted. Moreover, we

agree with the Third Circuit that the language "in chambers or

otherwise" strongly implies that the district court's discretion

includes "a decision regarding the availability and degree of

public access." PG Publishing, 28 F.3d at 1359. This section of 

the Act therefore provides "strong evidence" that Congress did

not intend mandatory closure of all juvenile proceedings, but

rather left the question of public access to the district court's

discretion. Id. 

The first paragraph of 5038(a) of the Act states that

"the records [of any juvenile proceeding] shall be safeguarded

from disclosure to unauthorized persons." Pointing to this

provision, the government contends that the Act explicitly

prohibits disclosure of juvenile records except to the entities

enumerated in subsequent paragraphs, and that this evidences

Congressional intent to create an across-the-board ban on

disclosure to any and all other parties. We do not think,

-12-

however, that this language is quite so conclusive; the section

does not explicitly mandate denial of public access to juvenile 

records, but provides only that the records are to be

"safeguarded from disclosure to unauthorized persons." Giving 

this phrase a less strained, more common sense reading, we think

that the section prohibits disclosure only to those persons not

authorized by the district court to receive such information. 

See PG Publishing, 28 F.3d at 1359 (reaching the same 

conclusion). The only express prohibitive mandate contained in

all of 5038(a) rests in the final paragraph, which prohibits

the district court from authorizing disclosure in situations

"when the request for information is related to an application

for employment, license, bonding or any civil right or

privilege."

Nor do we think that the parties enumerated in

paragraphs (a)(1) through (a)(6) of 5038 constitute the

exclusive list of persons intended by Congress to ever receive

information about juvenile proceedings. Rather, the paragraphs

merely list those persons who have a right to obtain juvenile

records upon request. Indeed, if this were meant to be an

exclusive list, then the final paragraph of the section

(prohibiting disclosure when the information is sought in

relation to a job application, etc.) would be superfluous. PG 

Publishing, 28 F.3d at 1360. Read as a whole, then, we think 

that 5038(a) further evidences Congressional intent to leave

-13-

disclosure of juvenile records within the district court's

discretion.5

The only section of the Act that suggests that Congress

intended an across-the-board bar to public access is 5038(e),

which provides that "neither the name nor picture of any juvenile

shall be made public in connection with a juvenile delinquency

proceeding." The district court reasoned that if it were to

permit public access to the proceedings, the juveniles' names

would certainly, unavoidably, be made public, in direct

contravention of 5038(e). 862 F. Supp. at 655. Because it saw

no way to obey the letter of 5038(e) short of closing the

proceedings, the district court interpreted the Act to mandate

closure. Id. at 655-56. The government now urges us to affirm 

this interpretation, arguing that any other reading would render

the confidentiality provisions a nullity.

On this point, however, we are persuaded once again by

the reasoning of the PG Publishing court, which explained: 

A prohibition against making a juvenile's
name or picture available to the public,
however, strikes us as an indirect and
unlikely way for Congress to stipulate
that all hearings under the Act will be
closed to the public. State statutes
that restrict access to juvenile
proceedings generally do so directly and
 

5 The language of 5038(c) does not conflict with our
interpretation. This section provides that all information and
records relating to the proceeding "shall not be disclosed
directly or indirectly to anyone other than the judge, counsel
for the juvenile and the Government, or others entitled under 
this section to receive juvenile records." (Emphasis added). We 
read the underlined phrase to mean any other persons authorized
by the court to receive information under 5038(a).

-14-

clearly. . . . We think it far more
likely that 5038(e) was intended not to
limit the discretion of trial judges to
regulate access to juvenile delinquency
proceedings, but to foreclose law
enforcement officials from holding press
conferences at which the name and picture
of the juvenile would be "made public in
connection with a juvenile delinquency
proceeding."

28 F.3d at 1360-61 (quoting 18 U.S.C. 5038(e)). Certainly, if

Congress intended to mandate closure of all juvenile proceedings,

it could have done so expressly and directly. Cf., e.g., 18 

U.S.C. 3509(e) (authorizing "the exclusion from the courtroom

of all persons, including members of the press, who do not have a

direct interest in the case" during the testimony of child

witnesses).

We also agree with the Globe that even if the

prohibition on disclosure of a juvenile's name and picture

prevents unfettered public access to proceedings, it does not

necessarily follow that 5038(e) commands total closure. The

statutory directive can in many instances be satisfied by other,

less restrictive means. For example, public access to records or

proceedings poses no risk of disclosure of the juvenile's

picture, as cameras can be banned from the proceedings and names

redacted from documents. Similarly, there are methods short of

complete closure, such as the use of initials or pseudonyms, that

would protect against inadvertent disclosure of the juveniles'

names.

Finally, we think that interpreting the entire Act in

light of 5038(e), rather than vice versa, attributes undue

-15-

significance to that section. To hold that the Act must mandate

closure because of 5038(e) is effectively to ignore strong

indicia elsewhere in the statute that Congress did not intend to

create a blanket prohibition on public access, but rather to vest

discretion with the district courts to fashion proceedings in a

manner most appropriate for each individual case.

For these reasons, we hold that the Act does not

mandate across-the-board closure for all juvenile proceedings,

but merely authorizes closure, or any other measures designed to

ensure confidentiality, to be determined on a case-by-case basis

at the discretion of the district court.6 We think that this

interpretation fully comports with the purpose and language of

the statute as a whole, and is far preferable to a strained

construction of the Act that mandates complete closure and thus

triggers First Amendment concerns.

V. V.

We turn now to the Globe's final contentions on appeal,

namely, that the district court's articulated reasons for closing

the proceedings are not "sufficiently compelling" to justify

closure in this case, that the court's order does not effectively

serve its intended interests, and that the order is not "narrowly

tailored." The Globe offers several theories in support of these

contentions, none of which we find persuasive.

 

6 We emphasize that we are not holding or even suggesting that
juvenile proceedings ought to be open. We are merely holding
that the Act does not invariably require them to be closed.

-16-

As an initial matter, we note that the Globe's

arguments on this point seem to rest on the assumption that

juvenile proceedings should be open as a rule, and only

compelling interests justify closure. Certainly, a district

court must exercise its discretion soundly, and must articulate

reasons which are supported by the record and in keeping with the

policies of the Act. Contrary to the Globe's implied assumption,

however, the language and policy of the Act, as well as the

history of juvenile justice proceedings in this country over the

past century, indicate that a court's exercise of its discretion

to close juvenile proceedings is not an exception to some general

rule of openness, but the norm.

The district court's findings here were meticulously

specific. The court first correctly noted the Act's overarching

objective of protecting juveniles from stigma in order to

facilitate rehabilitation. 862 F. Supp. at 657. The court found

that these juveniles were particularly amenable to

rehabilitation, based on the prosecutor's decision not to seek

transfer to adult status and the clean prior records of two of

the juveniles. Id. The district court also gave weight to the 

juveniles' opposition to open proceedings, noting that the media

had already subjected the youths to overwhelming publicity, and

concluding that adequate protection of the juveniles from stigma

and public scrutiny would be impossible unless the proceedings

were closed. Id. 

-17-

The Globe contends that the court should not have

relied upon the opposition of the juveniles themselves to open

proceedings, as such a wish is "unremarkable" and "does not

suggest that this case involves any individualized concern for

closure different from those present in virtually every juvenile

proceeding." As the government points out, however, protection

of the accused is one of the strongest justifications for

allowing public access to the proceeding. When the accused

juvenile, on advice of counsel, opposes public access, this

justification is vitiated. Further, the juveniles' own

assessment of their interests is a highly reliable indicator of

whether they will be irreparably stigmatized by open proceedings.

Given the Act's strong policy in favor of protecting juveniles

from such stigma, we think the juveniles' opposition to open

proceedings was a relevant factor for the district court to

consider.

The Globe also attempts to downplay the significance of

the fact that the juveniles had not been transferred for adult

prosecution. The prosecutors' determination not to transfer the

juveniles is based on an evaluation of criteria set forth by the

Act, including the age and social background of the juvenile, the

nature of the alleged offense, the extent of the juvenile's prior

record, and the juvenile's present intellectual development and

psychological maturity. 18 U.S.C. 5032. Because all of these

criteria are highly significant indicators of the amenability of

the juvenile to rehabilitation, they are also very relevant to

-18-

the court's decision whether to close the proceedings. By taking

the prosecutors' decision into consideration, then, the court was

also giving weight to these factors. That these factors will

often militate in favor of closure in juvenile proceedings does

not in any way diminish their relevance or weight; to the

contrary, it merely underscores the Act's strong preference for

preserving the confidentiality of juvenile records.7

The Globe also contends that the district court's order

does not effectively serve its intended interests, as nothing in

the court's opinion indicates that the closure order will

"effectively preserve the juveniles' confidentiality." In its

opinion, the district court recognized that media coverage of the

proceedings had already been extensive, that one of the juveniles

had already been interviewed, that the juveniles had already been

identified several times in the press, and that many of the

details of their alleged conduct had already been disclosed

through the related adult criminal prosecution of Clayton. 862

F. Supp. at 659. The Globe now points to these facts and argues

that because all this information had already been aired in the

press, "whatever stigma the juveniles may acquire will attach

even if the press is excluded from the proceedings." Therefore,

 

7 The Globe also suggests that the heinous nature of the
juveniles' alleged conduct augments the public interest in
"seeing justice done," and therefore supports opening the
proceedings. Given the Act's policy of preventing stigma,
however, this argument is completely misguided. It is precisely
because the alleged crimes have provoked so much public outrage 
and antipathy that closure becomes more appropriate, in order to
best effectuate the Act's purpose.

-19-

according to the Globe, because the district court's closure

order cannot possibly preserve the juveniles' anonymity, it is

ineffective, and cannot stand.

This is a flawed, circular argument with disturbing

ramifications. Essentially, the Globe is arguing that because

the press has already obtained and published some information, 

any further attempts by the district court to preserve

confidentiality are either futile or irrelevant. Contrary to the

Globe's contention, the fact that the juveniles have already

suffered stigma does not justify removing or denying them all

further protections created by the Act. Moreover, we agree with

the government that to allow the media to "leverage" partial

information into an unfettered right of access to otherwise

nonpublic proceedings would grant the media a dangerous control

over important state interests. We therefore reject the Globe's

contentions on this point, and hold that the district court's

closure order sufficiently serves its stated purpose of

preserving what confidentiality remains of the proceedings.

The Globe also argues that the district court's closure

order is not "narrowly tailored." Because the district court

could have effected its intended purpose through less restrictive

means, such as using pseudonyms and redacting identifying

information from proceedings and records, the Globe argues, its

total ban on public access was unwarranted. Again, we note that

the Globe is relying on the dubious assumption that district

courts must meet the extremely stringent First Amendment

-20-

standards applied to adult criminal cases in order to justify

closure of juvenile proceedings.

Even assuming, however, that such standards are

applicable here, we find that they are sufficiently met by the

court's order. As the district court recognized, it could not

bar the media from publishing information legally obtained. 862

F. Supp. at 657 (citing Smith v. Daily Mail Publishing Co., 443 

U.S. 97 (1979)). Because it had no way of ensuring that certain

identifying information would remain confidential if the

proceedings were open to the press, the court concluded that it

had no less restrictive alternative to closing the proceedings.

Id. We think this reasoning is quite sound. The identities of 

the juveniles had already been widely publicized. Redaction of

the juveniles' names from the proceedings as the Globe suggests

would therefore have been an exercise in futility.

Realistically, the press would merely publish detailed accounts

of the "redacted" proceedings, substituting the identifying

information previously obtained. In short, redaction, or any

other compromise measure, would have been ineffective in

preserving the confidentiality of the proceedings.8
 

8 We likewise reject the Globe's arguments that the district
court's order impermissibly infringes the public right of access
to court records by shifting the burden of obtaining access onto
the public. Rather than sealing the case file and requiring
interested parties to move for further disclosures, the Globe
suggests, the court should have done just the opposite and
required trial counsel to move for impoundment of particular
documents. This contention is yet another example of the Globe's
attempt to force juvenile proceedings into the First Amendment
framework developed for adult criminal proceedings. Section
5038(a) of the Act specifically provides that throughout a

-21-

Finally, the Globe contends that the district court's

order violates the public's common law right of access to

proceedings and records. It is true that "courts of this country

recognize a general right to inspect . . . judicial records and

documents." Nixon v. Warner Communications, Inc., 435 U.S. 589, 

597 (1978). The Supreme Court has explained, however, that this

right is not absolute; rather, the decision as to such access is

"best left to the sound discretion of the trial court, a

discretion to be exercised in light of the relevant facts and

circumstances of the particular case." Id. at 598-99. Assuming 

that this common law right of access applies to juvenile court

records,9 we do not think that the district court's order here

improperly infringes on this right. In this context, the

qualified common law right of access to proceedings has been

supplanted by the statutory scheme of the Act. As we interpret

them, however, the Act's confidentiality provisions do not

significantly alter or restrict that common law right in any way,

but leave public access to the sound discretion of trial courts.

Because the district court's order fully comports with the

 

juvenile delinquency proceeding, "the records shall be
safeguarded from disclosure to unauthorized persons." As we have
explained, this section grants the district court the discretion
to release juvenile records as it deems appropriate. The
district court's order here meticulously tracks this language of
the Act, and we therefore find that its method of determining
public access to court records is entirely proper.

9 It is not altogether clear that this common law right of
access applies to juvenile court records, in light of the long,
sound tradition of preserving the confidentiality of juvenile
proceedings. See supra note 4. 

-22-

provisions of the Act and is thus a proper exercise of its

discretion, the order cannot be said to infringe on any pre-

existing common law right of access. We therefore reject the

Globe's arguments on this point.

VI. VI.

In sum, we hold that the Act authorizes, but does not

mandate, the closure of juvenile proceedings. The district

court's closure order was fully justified on the record and was

therefore an entirely proper exercise of its discretion under the

Act.

Affirmed. 

-23-